# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

---------------------------------------------------------- x
: Chapter 11
In re: :
: Case No. 23-90794 (MI)
BARRETTS MINERALS INC., *et al.*,[1] :
: **(Jointly Administered)**
Debtors. :
: **Re: Docket No. 193**
---------------------------------------------------------- x

## DECLARATION OF DAVID J. GORDON IN SUPPORT OF
## DEBTORS' OBJECTION TO MOTION OF THE
## OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO TRANSFER VENUE

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Barretts Minerals Inc. (8715) and Barretts Ventures Texas LLC (0787). The Debtors' address is 5605 North MacArthur Boulevard, Suite 1000, PMB 139, Irving, Texas 75038.

US-DOCS\146602840.3

Under 28 U.S.C. § 1764, I, David J. Gordon, declare as follows under the penalty of perjury:

1.      I am the Chief Restructuring Officer ("**CRO**") of Barretts Minerals Inc., a Delaware corporation ("**BMI**"), and Barretts Ventures Texas LLC, a Texas limited liability company ("**BVT**", and together with, BMI, the "**Debtors**"), debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

2.      Since I was engaged as CRO of BMI and BVT in July 2023 and September 2023, respectively, I have been responsible for overseeing the restructuring activities and related operations of the Debtors, as well as developing and managing the real estate business of the Debtors. As a result of my experience with the Debtors, my review of public and non-public documents (including the Debtors' books and records), and my discussions with other members of the Debtors' management team, I am generally familiar with the Debtors' businesses, financial condition, policies and procedures, day-to-day operations, and books and records, and have also become generally familiar with the operations and business of various non-debtor affiliates, including Minerals Technologies Inc. ("**MTI**") and Specialty Minerals Inc. ("**SMI**"). Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisors that report to me in the ordinary course of my responsibilities. Specifically, in my role as the Debtors' CRO, I have familiarized myself generally with and have general knowledge of the talc-related claims asserted against BMI, which include actions in which BMI affiliates are also named as defendants. If called upon to testify, I would testify competently to the facts set forth in this declaration (the "**Declaration**"). I am authorized to submit this Declaration on behalf of the Debtors in support of

1

the *Debtors' Objection to the Motion of the Official Committee of Unsecured Creditors to Transfer Venue*.

A.  **The Chapter 11 Cases**

3.  On October 2, 2023 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**"),[2] in the United States Bankruptcy Court for the Southern District of Texas.

4.  The Debtors' decision to commence the Chapter 11 Cases was prompted by the growing number of talc-related personal injury claims asserted against BMI coupled with: (i) an increase in settlement demands with respect to such claims; (ii) the unavailability of insurance coverage due to allegations of asbestos contamination; (iii) the unwillingness of Pfizer to provide comprehensive indemnification for BMI's mounting potential liability exposure pursuant to Pfizer's contractual indemnification obligations; and (iv) an anticipated increase in the number of talc-related claims that are not covered by insurance or indemnity rights.

5.  In my role as the Debtors' CRO, I have generally familiarized myself with the talc-related personal injury claims pending against BMI as of the Petition Date, which were pending in various jurisdictions throughout the United States. Among the more than 550 pending talc cases against BMI and certain non-debtor affiliates, I am not aware of any such cases filed in Montana. In contrast, I am aware of at least six such lawsuits pending against BMI and/or its affiliates that were filed in Texas.

---

[2] References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanations provided by counsel and other advisors to the Debtors.

2

6. The primary purpose of the Chapter 11 Cases is to address and comprehensively resolve BMI's liabilities arising from talc. The Debtors intend to achieve this goal by continuing to negotiate—and ultimately confirming—a plan of reorganization pursuant to sections 524(g) and 1129 of the Bankruptcy Code that creates a trust under section 524(g) of the Bankruptcy Code (a "**524(g) Trust**") vested with substantial assets for the benefit of current and future talc claimants in order to fairly and equitably address talc claims. While the Debtors remain hopeful that they will be able to pursue and ultimately confirm such a plan of reorganization with broad support among their constituents, they are not obligated to pursue a plan in any specific form or with any specific substance.

7. The Debtors' decision to file the Chapter 11 Cases in the Southern District of Texas was the result of careful consideration of a number of factors, including the location of their assets, the logistics of travel for their executives and professionals, and the costs associated with filing in the Southern District of Texas compared to other jurisdictions for which I understand the Debtors meet the criteria for venue.

**B.     BMI's Assets and Operations**

8. On August 7, 1992, BMI was incorporated to hold and operate certain talc-related assets acquired from Pfizer. BMI has remained a separate legal entity since its creation. BMI owns the full value chain of its talc operations, including two mines located in Dillon, Montana (the Regal-Imperial Mine and the Treasure Mine) and two talc facilities located in Dillon, Montana and Bay City, Texas. In 1998 and 1999, BMI built the talc facility in Bay City, Texas (the "**Bay City Facility**"). BMI has maintained operations in Texas since that time—nearly 25 years. The Bay City Facility is one of BMI's two key talc facilities, at which BMI talc is blended with other proprietary materials, stored in silos, and shipped to customers via rail and ground transportation.

3

The Opti-Block talc product produced at the Bay City Facility has historically accounted for 5% to 10% of BMI's annual talc sales.

9. While BMI's operating assets are located in Montana and Texas, its principal officers are based in California and New York. BMI does not share a headquarters with MTI or any other affiliate in Montana.

C. **BMI's Acquisition of Properties & Creation of BVT**

10. In order to obtain the finality possible through a section 524(g) plan, BMI concluded it would need to cease its talc-generating activities. BMI therefore initiated a robust prepetition marketing process for its talc-related assets and operations. That marketing process remains ongoing. Upon closing of BMI's proposed asset sale, BMI will have no employees or vendors in Montana. In fact, the only state in which either BMI or BVT will own tangible assets is Texas.

11. Because objecting parties in other asbestos bankruptcies have argued that, to comply with section 524(g), a debtor must have "an ongoing business," BMI and its advisors determined (in an abundance of caution) to develop a secondary business consisting of stable, revenue-generating assets unrelated to BMI's talc business. Ultimately, BMI decided to develop a real estate business consisting of properties subject to long-term, triple-net leases for quick service restaurants.

12. Among my responsibilities as the Debtors' CRO, I was principally in charge of identifying potential properties for acquisition and making a recommendation to the board of directors. I have significant experience in triple-net lease investments through my prior roles working with chapter 11 debtors and in the quick service restaurant industry.

13. Beginning in June 2023, I worked with a broker to identify potential properties. I considered properties in a number of locations and states, focusing on the availability of high

4

quality properties that I believed would hold and potentially increase in value and consistently generate revenue. One obvious choice was Texas—a state to which BMI had a longstanding connection through the Bay City Facility. Unlike Montana, the only other state in which BMI already had assets and operations (all of which it is in the process of selling), Texas enjoys dense urban centers and significant population growth. These characteristics, in my judgment, enhance the value and stability of a potential investment by increasing the likelihood of any lessee performing over the term of its lease and any extensions. Although Montana was also considered as a potential location in which we would look to acquire properties, no acceptable Montana properties were available for purchase at the time we were looking. I also reviewed property data packages for locations in Illinois, Ohio, Connecticut, Florida, Arizona, Nebraska, Georgia, Arkansas, Mississippi, Kentucky, South Dakota, Maryland, and Washington. Ultimately, I concluded that two properties in Texas presented conservative investment opportunities with only a modest start-up investment required.

14. In the first half of July 2023, I recommended that BMI move forward with the purchase of both Texas properties. At a meeting held on July 12, 2023, BMI's Board of Directors approved such purchases for a maximum aggregate consideration of up to $6 million, subject to continued diligence. A true and correct copy of the Minutes of the July 12, 2023 meeting of BMI's Board of Directors is attached hereto as **Exhibit A**.

15. BMI submitted letters of intent regarding a property located in San Antonio, Texas (the "**San Antonio Property**"), which is subject to a triple-net lease with McDonalds USA LLC, and a property located in San Angelo, Texas (the "**San Angelo Property**"), which is subject to a triple-net lease with Whataburger Restaurants, LLC. The purchases of these properties closed on September 27 and September 28, 2023, respectively. BMI financed the purchase of both the San

Antonio Property and the San Angelo Property through a draw on an intercompany note issued by BMI's indirect parent company, MTI.

16. On July 24, 2023, as BMI was negotiating the acquisition of the Texas properties, BMI formed BVT as a Texas limited liability company domiciled in Texas in order to hold one of BMI's property acquisitions. In my experience, it is common to create an individual limited liability company to hold such property acquisitions. Upon closing of the acquisitions, BMI assigned its interests in one of the real properties (the San Angelo Property) to BVT. BMI retained the San Antonio Property so that it would have continuing business operations and satisfy any "ongoing business" requirement under section 524(g), even after selling its talc operations.

17. BVT is a wholly owned subsidiary of BMI. BVT has been resident in Texas since its formation. BMI and BVT also maintain office space in Irving, Texas. BVT has no assets, employees, or other connection to Montana.

**D.    Inconvenience Associated with Requested Transfer of the Chapter 11 Cases to Montana**

18. I believe it would be highly inconvenient for the Debtors, as well as for other stakeholders, for the Chapter 11 Cases to be transferred to Montana. I am based in California. BMI's President and Chief Executive Officer, D.J. Monagle, III, is based in New York. None of the Debtors' executives lives or works in Montana. The Debtors do not anticipate that BMI's mining and plant employees will be called upon to attend hearings in person. The professionals engaged by the Debtors are based principally in California, New York, and Washington, D.C., and I understand that the professionals engaged by other stakeholders likewise are based on the East Coast. From just a cursory review of available flights, I am concerned with the ability of professionals and necessary witnesses to easily travel to Montana.

19.     I believe it would also lead to greater administrative expense if the Chapter 11 Cases were transferred to Montana.  Among the added administrative expense would be the need to retain new local counsel in a different jurisdiction.

**E.      BMI Indemnity Agreement**

20.     On September 28, 2023, BMI, on the one hand, and MTI and SMI on the other hand, entered into that certain Indemnity Agreement (the "**BMI Indemnity Agreement**"), pursuant to which BMI agreed to indemnify, defend, and hold harmless the BMI Affiliates for any Losses (as defined in the BMI Indemnity Agreement) arising directly or indirectly from (i) Indemnitor Liabilities[3] and (ii) reimbursement or other obligations of the BMI Affiliates under or in respect of any appeal bonds or similar litigation-related surety contracts that are or have been posted or entered into, or that may in the future be posted or entered into, by the BMI Affiliates in connection with proceedings in respect of or related to any Indemnitor Liabilities (the "**BMI Indemnity**").  A true and correct copy of the BMI Indemnity Agreement is attached hereto as **Exhibit B**.  The BMI Indemnity Agreement memorializes and more formally recognizes the concept that, as between BMI and its affiliates (and holding aside the Pfizer Indemnity, which provides separate coverage to BMI and its affiliates for talc-related liabilities), liability, if any, associated with Talc Claims and related expenses, regardless of whether asserted against BMI, MTI, or SMI, are attributable to BMI as the entity that mined, beneficiated, processed, and sold talc alleged to have caused personal injury to claimants.

21.     As part of the consideration provided to the Debtors in connection with the BMI Indemnity Agreement, BMI was released from obligations under MTI's third-party credit facility

---

[3]  "Indemnitor Liabilities" is defined in the BMI Indemnity Agreement as "any Liabilities related in any way to (i) Indemnitor Assets or (ii) alleged conduct of or failures to act by Indemnitor, including, without limitation, any such conduct or failures to act relating to products mined or sold by Indemnitor."  "Indemnitor Assets" is defined in the BMI Indemnity Agreement as "any assets at any time owned or operated by Indemnitor."

and notes indenture, thereby becoming an "unrestricted subsidiary." BMI's designation as an unrestricted subsidiary was of significant benefit for the estate and its stakeholders, including the Committee's constituents. BMI's designation as an unrestricted subsidiary under both the credit facility and the notes indenture eliminated over $1 billion of debt against BMI's estate <u>and</u> rendered all of BMI's assets unencumbered. In other words, without this release, BMI would have had <u>no assets</u> available for distribution to tort claimants because MTI's lender held a security interest in all of BMI's assets.

## **CONCLUSION**

22.     The Debtors have remained steadfast in their goal of reaching a consensual plan of reorganization providing an equitable and ratable treatment for their current and future tort claimants. Notwithstanding the Debtors' efforts to date, the Committee has objected to all material motions, sought transfer of these cases, and refused to engage in negotiations through a formal mediation process or otherwise. The Debtors stand ready and prepared to engage in productive discussions with the Committee and other stakeholders.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of November 2023.

*/s/ David J. Gordon*
David J. Gordon
Chief Restructuring Officer
Barretts Minerals Inc. and Barretts Ventures Texas LLC

9