**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

```
-------------------------------------------------------- x
                                                         :
In re:                                                   :   Chapter 11
                                                         :
BARRETTS MINERALS INC., et al.¹                          :   Case No. 23-90794 (MI)
                                                         :
                Debtors.                                 :   (Jointly Administered)
                                                         :
                                                         :   (Emergency Hearing Requested)
-------------------------------------------------------- x
```

**DEBTORS' <u>EMERGENCY</u> MOTION**
**FOR ENTRY OF AN ORDER (I) AUTHORIZING**
**DEBTORS TO ENTER INTO POST-PETITION FINANCING**
**AGREEMENT AND OBTAIN POST-PETITION FINANCING PURSUANT**
**TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING DEBTORS TO**
**ENTER INTO SECOND AMENDMENT TO SHARED SERVICES AGREEMENT AND**
**<u>(III) GRANTING RELATED RELIEF</u>**

---

**Emergency relief has been requested. Relief is requested not later than 1:30 p.m. (prevailing Central Time) on May 21, 2024.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on May 21, 2024, at 1:30 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002. You may participate in the hearing either in person or by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Isgur's conference room number is 954554. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Isgur's home page. The meeting code is 954554. Click the settings icon in the upper right corner and enter your name under the personal information setting.**

---

¹ The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Barretts Minerals Inc. (8715) and Barretts Ventures Texas LLC (0787). The Debtors' address is 5605 North MacArthur Boulevard, Suite 1000, PMB 139, Irving, Texas 75038.

US-DOCS\150766561

Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Isgur's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") respectfully represent as follows in support of this motion (this "**Motion**"):

## PRELIMINARY STATEMENT

1.      As reiterated since the Petition Date, the Debtors' ultimate goal in the Chapter 11 Cases (as defined below) is to confirm a plan of reorganization that will comprehensively resolve all current and future talc-related claims against BMI (as defined below). The Debtors anticipated that the JMB DIP (as defined below), coupled with proceeds from a sale of BMI's talc assets, might give the Debtors sufficient liquidity to achieve a consensual and value maximizing resolution of the Chapter 11 Cases. However, the Debtors have faced unexpected obstacles, including a sale process that yielded lower than expected proceeds and opposition from the Unsecured Creditors Committee (as defined below) with respect to several matters, that have delayed the Chapter 11 Cases and resulted in increased costs. The JMB DIP, which provided the Debtors with liquidity during the initial phases of the Chapter 11 Cases, was paid off with proceeds from the Sale (as defined below). Given the Debtors' current liquidity position following the Sale and the paydown of the JMB DIP, the Debtors require access to additional funding.

2.      After exploring alternative financing options, the only actionable path forward is the current proposal, which contemplates that Minerals Technologies Investments LLC (the "**Lender**"), a wholly-owned subsidiary of Minerals Technologies Inc. ("**MTI**"), the Debtors' ultimate parent entity, will provide new debtor-in-possession financing (the "**New DIP**"). The total commitment under the DIP Credit Agreement (as defined below) is $30,000,000 (the "**DIP Facility**"). It is expected that the New DIP will provide BMI with liquidity (a) to fund the Chapter

2

11 cases through emergence through confirmation of a consensual plan of reorganization following a successful mediation with the Unsecured Creditors Committee and the FCR (as defined below) or (b) in the event a consensual resolution is unattainable, to engage in litigation in the Chapter 11 Cases to confirm that BMI's talc has not caused harm to claimants.  Absent the New DIP, the Debtors will not have access to sufficient liquidity to resolve the Chapter 11 Cases.

3.      At bottom, the New DIP provides the Debtors with needed liquidity and does so on terms that cannot be matched by a third-party lender.  For the reasons discussed herein, the New DIP is in the best interests of the Debtors' estates and all stakeholders and is fair and reasonable, and entry into the New DIP represents a sound exercise of the Debtors' business judgment.

## **RELIEF REQUESTED**

4.      By this Motion, the Debtors seek entry of an order substantially in the form attached hereto (the "**DIP Order**"), authorizing the Debtors to:[2]

(a)      enter into the Debtor-in-Possession Credit Agreement (the "**DIP Credit Agreement**"), dated as of May 14, 2024 between Barretts Minerals Inc. ("**BMI**", the "**Borrower**", or the "**Loan Party**"), as borrower, and the Lender.  A true and correct copy of the DIP Credit Agreement is attached as **Exhibit 1** to the DIP Order.[3]

(b)      borrow funds up to the maximum aggregate principal amount of $30,000,000 (plus amounts in respect of accrued interest capitalized thereon) and perform their obligations pursuant to the terms and provisions of a delayed draw term loan facility provided under the DIP Credit Agreement and DIP Order (collectively with the Approved Budget (as defined below), the "**DIP Financing Documents**"), and to use the proceeds of each cash loan under the DIP Credit Agreement (each, a "**DIP Loan**" and collectively, the "**DIP Loans**") to fund the reasonable administrative expenses of the Chapter 11 Cases in compliance with the DIP Financing Documents;

---

[2]    Capitalized terms used but not otherwise defined in this section have the meaning ascribed to such terms elsewhere in the Motion or the DIP Order.

[3]    BMI is the sole borrower under the New DIP and will use proceeds from the New DIP to pay any and all costs incurred by Debtor Barretts Ventures Texas LLC ("**BVT**").

     (c)      modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to permit the Lender to exercise its rights and remedies under the DIP Financing Documents; and

     (d)      enter into the Second Amendment to Shared Services Agreement by and between MTI, Specialty Minerals Inc. ("**SMI**"), and BMI attached as **Exhibit A** hereto under section 363 of the Bankruptcy Code.

5.      In support of this Motion, the Debtors submit the (a) *Declaration of Leon Szlezinger in Support of the Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to Enter into Post-Petition Financing Agreement and Obtain Post-Petition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing Debtors to Enter Into Second Amendment to Shared Services Agreement and (III) Granting Related Relief* (the "**Szlezinger Declaration**");[4] (b) *Declaration of William Murphy in Support of the Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to Enter into Post-Petition Financing Agreement and Obtain Post-Petition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing Debtors to Enter Into Second Amendment to Shared Services Agreement and (III) Granting Related Relief* (the "**Murphy Declaration**"); and (c) *Declaration of David Gordon in Support of the Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to Enter into Post-Petition Financing Agreement and Obtain Post-Petition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing Debtors to Enter Into Second Amendment to Shared Services Agreement and (III) Granting Related Relief* (the "**Gordon Declaration**"), in each case, filed contemporaneously herewith.  The initial budget reflecting the anticipated disbursements for each

---

[4]    The Debtors also incorporate by reference the *Declaration of Leon Szlezinger in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (a) Authorizing the Debtors to (I) Obtain Senior Secured Superpriority Postpetition Financing and (II) Use Cash Collateral; (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status; (C) Modifying the Automatic Stay; (D) Scheduling a Final Hearing; and (E) Granting Related Relief* [Docket No. 15] (the "**Szlezinger JMB DIP Motion Declaration**", and together with the Szlezinger Declaration, the "**Szlezinger Declarations**")

week during the period from the date of entry of the DIP Order (the "**DIP Effective Date**") through and including September 30, 2024 is attached as **Exhibit B** to the DIP Credit Agreement.

## JURISDICTION AND VENUE

6.      The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157 (b).  The Debtors confirm their consent to the entry of a final order or judgment by the Court in connection with this Motion.

7.      Venue is proper pursuant to 28 U.S.C. § 1408.

8.      The statutory and legal predicates for the relief requested herein are sections 105, 362, 363, and 364 of the Bankruptcy Code, rules 2002 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), rules 2002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), and the Procedures for Complex Cases in the Southern District of Texas (the "**Complex Case Procedures**").

## BACKGROUND

**A.      Chapter 11 Cases**

9.      On October 2, 2023 (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code.  On the Petition Date, the Court entered an order authorizing the joint administration and procedural consolidation of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1 [Docket No. 23].  The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On October 20, 2023, the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") appointed an official committee of unsecured creditors [Docket No. 138] consisting of seven talc claimants.  On January 23, 2024, the U.S.

Trustee filed an amended notice reconstituting the official committee of unsecured creditors [Docket No. 565] consisting of seven talc claimants (the "**Unsecured Creditors Committee**"). On November 20, 2023, the Court appointed a legal representative for future talc personal injury claimants (the "**FCR**") [Docket No. 307].  As of the date hereof, no trustee or examiner has been requested in the Chapter 11 Cases.

10.     The factual background regarding the Debtors, including their capital and debt structures, and the circumstances leading to the commencement of the Chapter 11 Cases, is set forth in detail in the *Declaration of David J. Gordon, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 13] (the "**First Day Declaration**"), which was filed on the Petition Date and is incorporated herein by reference.

**B.     JMB DIP**

11.     On the Petition Date, in order to fund the Chapter 11 Cases until a Sale was consummated, the Debtors sought approval of a $30,000,000 postpetition financing facility (the "**JMB DIP**") pursuant to a DIP credit agreement (the "**JMB DIP Credit Agreement**") with JMB Capital Partners Lending, LLC (the "**Initial DIP Lender**") [Docket No. 14].  On October 3, 2023, the Court entered an order [Docket No. 67] approving the Debtors' entry into the JMB DIP Credit Agreement on an interim basis.  On December 18, 2023, the Court entered the *Final Order (A) Authorizing the Debtors to (I) Obtain Senior Secured Superpriority Postpetition Financing and (II) Use Cash Collateral; (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status; (C) Modifying the Automatic Stay; (D) Scheduling A Final Hearing; and (E) Granting Related Relief* [Docket No. 453] (the "**Final JMB DIP Order**") approving the Debtors' entry into the JMB DIP Credit Agreement on a final basis.  Subsequent to entry of the Final JMB DIP Order, the Debtors and the Initial DIP Lender reached an agreement

to amend certain provisions of the JMB DIP Credit Agreement, including extending milestones applicable to the JMB DIP (the "**DIP Amendment**").  On February 8, 2024, the Court entered an order approving the DIP Amendment [Docket No. 612].

12.     As noted above, the JMB DIP provided the Debtors with liquidity to commence and consummate the Sale.  Though the amount available under the JMB DIP was $30,000,000, the Debtors only drew $15,000,000.  This amount, and related interest and expenses, was paid to the Initial DIP Lender from the Sale proceeds.

### C.     Sale Process

13.     On December 12, 2023, the Court entered the *Order Establishing Bidding Procedures Relating to the Sale of All or a Portion of the Debtors' Assets* [Docket No. 434] (the "**Bid Procedures Order**"), approving the procedures by which the Debtors would solicit, evaluate, and consummate a sale of BMI's talc assets (a "**Sale**").  After months of good faith negotiations with multiple bidders, the Debtors commenced an auction on March 8, 2024 [Docket No. 687].  The auction concluded on March 14, 2024, and the Debtors, in consultation with their professionals and the Consultation Parties (as defined in the Bid Procedures Order), selected Elevation NewCo, LLC as the Successful Bidder (as defined in the Bid Procedures Order) and IMI Fabi Montana, LLC as the Backup Bidder (as defined in the Bid Procedures Order) [Docket No. 725].  On March 25, 2024 the Court entered the *Order (I) Authorizing (A) the Sale of the Debtors' Assets, Free and Clear of All Liens, Claims, Encumbrances, and Other Interests and (B) the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief* [Docket No. 776] (the "**Sale Order**").  The Sale Order approved the sale of substantially all of BMI's talc assets to Elevation NewCo, LLC for a cash purchase price of $32 million and the assumption of certain liabilities.

14.     The Sale closed on April 29, 2024 [Docket No. 862].  Proceeds from the Sale were used to pay off the JMB DIP and are currently being used to fund the Chapter 11 Cases.

**D.      Identification of Additional Liquidity**

15.     Though the Debtors originally anticipated that the JMB DIP and Sale proceeds could give the Debtors sufficient liquidity to resolve the Chapter 11 Cases, as a result of the Debtors' inability to reach a negotiated resolution with the Unsecured Creditors Committee and the FCR, and the costs associated with extensive litigation in the Chapter 11 Cases, the Debtors require additional funding to progress the Chapter 11 Cases.  Thus far, the Debtors have devoted significant time and effort to the Chapter 11 Cases and plan to continue working diligently and efficiently toward a consensual chapter 11 plan in mediation with the Unsecured Creditors Committee and the FCR led by mediator Ken Feinberg.  The Debtors believe that the relief requested herein is essential to this effort.

16.     Based on the Debtors' marketing efforts in connection with the JMB DIP, outreach to third-party lenders prior to and subsequent to entry of the Sale Order, and the Debtors' advisors' experience with debtor-in-possession financing, the Debtors believe that the New DIP represents the best source of financing available to the Debtors.  As a result of the Sale, which left the Debtors with no operating assets (aside from cash and certain real property investments[5]), the ability of the Debtors to identify and negotiate favorable third-party financing is limited.

17.     The Debtors are at a critical juncture in the Chapter 11 Cases.  If mediation with the Unsecured Creditors Committee and the FCR is successful, the Debtors believe they can efficiently resolve the Chapter 11 Cases in a consensual manner.  To the extent negotiations fail, the Debtors intend to litigate the validity of the talc-related claims that were the impetus for the

---

[5]     *See* First Day Decl. at ¶¶ 33-35.

commencement of the Chapter 11 Cases.  In either scenario, the New DIP will provide the Debtors

with the best opportunity to exercise their rights and resolve the Chapter 11 Cases in a manner that

maximizes recoveries to claimants.

## CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001

18.     Pursuant to Bankruptcy Rule 4001 and the Complex Case Procedures, the following

table provides a concise statement and summary of the proposed material terms of the DIP

Financing Documents:[6]

| Summary of Material Terms | |
| --- | --- |
| **Parties to the Proposed DIP Facility**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Borrower**:  Barretts Minerals Inc.<br><br>**DIP Lender**: Minerals Technologies Investments LLC |
| **Purpose**<br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)* | A critical need exists for BMI to enter into the DIP Credit Agreement.  Without availability under the DIP Credit Agreement, the Debtors will not have sufficient liquidity to administer and resolve the Chapter 11 Cases.  Under the circumstances, the Debtors' access to the DIP Loans is vital to executing and resolving these Chapter 11 Cases.  Without access to the DIP Loans upon the terms set forth in the DIP Order, the Debtors and their estates will be immediately and irreparably harmed.  *See* DIP Order, Section C. |

---

[6]   This statement is qualified in its entirety by reference to the applicable provisions of the DIP Financing Documents.  To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Financing Documents, the provisions of the DIP Financing Documents will control.  Capitalized terms used but not otherwise defined in this section have the meaning ascribed to such terms in the DIP Financing Documents.

| Summary of Material Terms | |
|---|---|
| **Borrowing Limits**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)A* | Up to $30,000,000 of DIP Loans which shall be available upon entry of the DIP Order and satisfaction of other conditions precedent set forth in the DIP Credit Agreement.<br><br>Prior to the Plan Filing Date, the Lender shall not be required to make DIP Loans that would result in the aggregate principal amount of DIP Loans made by the Lender exceeding $15,000,000.<br><br>On and after the Plan Filing Date and before the Disclosure Statement Approval Date, the Lender shall not be required to make DIP Loans that would result in the aggregate principal amount of DIP Loans made by the Lender exceeding $20,000,000.<br><br>The Lender agrees to make the Reserved DIP Loan to the Borrower within (10) Business Days of the Effective Date.  The Borrower shall not use, or permit BVT to use, any proceeds of the Reserved DIP Loan for administrative expenses of the Chapter 11 Cases until the earlier of (i) the date on which the Borrower, the Unsecured Creditors Committee and the FCR reach an agreement on the terms of a Plan, (ii) the date on which the aggregate DIP Loan Commitments are terminated and the Borrower is no longer able to borrow DIP Loans, or (iii) the date on which the Unsecured Creditors Committee and the FCR files a notice with the Court withdrawing from the Mediation.<br><br>*See* DIP Order ¶ 5; DIP Credit Agreement Sections 2.1, 2.2, and 2.3. |
| **Approved Budget**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(iii)* | A copy of the Approved Budget is attached as **__Exhibit B__** to the DIP Credit Agreement. |
| **Interest Rates**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The unpaid principal amount of all DIP Loans shall bear interest at a rate per annum equal to 11% for the period from and including the date such DIP Loans are made to, but excluding, the earlier of (x) the date such DIP Loans are paid in full and (y) the date such DIP Loans are converted into a general unsecured claim (such earlier date, the "Repayment Date").<br><br>Upon the occurrence and during the continuation of an Event of Default, all DIP Loans and all other amounts outstanding under the DIP Credit Agreement, shall automatically bear interest at a rate per annum equal to 13.00%, except that the interest rate to apply upon the Repayment Date, and thereafter, will be equal to, but no greater than, the interest to be paid to all general unsecured creditors of the Borrower in a Chapter 11 plan of reorganization, if any.<br><br>Accrued interest on each DIP Loan shall be capitalized on the last Business Day of each calendar quarter commencing June 30, 2024; provided that so long as the Borrower is a debtor in a case under the Bankruptcy Code, the DIP Loans shall cease accruing interest on the Repayment Date.<br><br>Interest in respect of DIP Loans under the DIP Credit Agreement is calculated on the basis of a 365- or 366-day year, as applicable, for the actual days elapsed.<br><br>*See* DIP Credit Agreement Sections 4.3 and 4.4. |
| **Maturity Date**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)* | The earlier of (i) December 31, 2024 (or such later date agreed to by the Lender), (ii) the Consummation Date and (iii) the date the DIP Loans are accelerated in accordance with Section 10 of the DIP Credit Agreement.  For the avoidance of doubt, on the Maturity Date, the Lender will automatically have a general unsecured claim against the Borrower for the principal and interest and all other Obligations then due and owing under the DIP Financing Documents.<br><br>*See* DIP Credit Agreement Section 1.1. |

| Summary of Material Terms | |
|---|---|
| **Repayment Features / Roll-Up**<br><br>*Local Rule 4001-2(a)(i)(E) & (O)* | None. |
| **Conditions Precedent to Closing and Lending**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E)* | The obligation of the Lender to make its initial DIP Loan is subject to the satisfaction or waiver immediately to or concurrently with the making of such DIP Loan, as they case may be, of the following conditions:<br><br>• The Lender shall have received a counterpart of the DIP Credit Agreement duly executed and delivered by a duly authorized officer of the Loan Party.<br><br>• The Lender shall have received a copy of the DIP Order entered by the Court, and the DIP Order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended.<br><br>• The Lender shall have received an extended weekly Approved Budget for the period commencing on May 1, 2024 through at least September 30, 2024 that specifies in reasonable detail and separates into line items for each category of receipts or disbursements, (i) all of the Loan Party's projected unused availability of the DIP Loan Commitment under the DIP Credit Agreement and (ii) all of the Group Members' projected (A) Cash Operating Receipts, (B) Cash Operating Disbursements, (C) Net Operating Cash Flow, and (D) Restructuring Items, each on a weekly basis, and in form and substance reasonably acceptable to the Lender (the "<u>Initial Approved Budget</u>", as may be modified from time to time by a Budget Amendment Request made by the Borrower pursuant to Section 7.2(c) of the DIP Credit Agreement, the "<u>Approved Budget</u>"), which such Initial Approved Budget is attached to the DIP Credit Agreement as <u>Exhibit B</u>.<br><br>*See* DIP Credit Agreement Section 6.1.<br><br>The obligation of the Lender to make any DIP Loan is subject to the satisfaction of the following conditions precedent on the relevant Borrowing Date:<br><br>• Each of the representations and warranties made in or pursuant to Section 5 of the DIP Credit Agreement or which are contained in any other DIP Financing Document shall be true and correct in all material respects on and as of such Borrowing Date as if made on and as of such date (unless stated to relate to a specific earlier date, in which case, such representations and warranties shall be true and correct in all material respects as of such earlier date).<br><br>• No Default or Event of Default shall have occurred and be continuing on such Borrowing Date or will occur after giving effect to such DIP Loan.<br><br>• The Lender shall have received a Borrowing Compliance Certificate.<br><br>• The DIP Order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended.<br><br>• The Lender shall have received a Notice of Borrowing from the Borrower.<br><br>• The Lender shall have received from the Loan Party a Variance Report to the extent required to be delivered on or before the making of such DIP Loan, which such Variance Report shall be subject to Section 7.2(c) of the DIP Credit Agreement.<br><br>• With respect to any borrowing, the result of which the aggregate DIP Loans exceed the Interim First Commitment, the Plan Filing Date shall have occurred.<br><br>• With respect to any borrowing, the result of which the aggregate DIP Loans exceed the Interim |

| Summary of Material Terms | |
|---|---|
| | Second Commitment, the Disclosure Statement Approval Date shall have occurred.<br><br>*See* DIP Credit Agreement Section 6.2. |
| **Events of Default**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)(M)* | The DIP Credit Agreement contains customary events of default for financings of this type, which are set forth in Section 10 of the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement Section 10. |
| **Carve Out**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)(F)* | All claims granted by the DIP Order are subject to the Carveout.  As used in the DIP Order, "Carveout" means (i) the unpaid fees of the clerk of the Court and statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate under 37 U.S.C. § 3717, (ii) from and after the delivery of written notice from the Lender to BMI of the occurrence, and during the pendency, of an Event of Default, the allowed fees and expenses payable under sections 327, 328, 330 and 331 of the Bankruptcy Code to professional persons retained pursuant to an order of the Court by the Debtors, the Unsecured Creditors Committee, and the FCR (collectively, "Professional Persons"), in an aggregate amount not to exceed $3,000,000 (plus all such unpaid professional fees and expenses incurred prior to notice of such Event of Default to the extent allowed by order of the Court (whether before or after notice of such Event of Default) and payable pursuant to an order of the Court and incurred in accordance with the DIP Financing Documents), and (iii) the reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code.  So long as no Event of Default shall have occurred and be continuing, the Debtors shall, subject to the DIP Financing Documents, be permitted to pay compensation and reimbursement of expenses allowed by the Court and payable under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, and the same shall not reduce the Carveout.  Notwithstanding anything to the contrary contained in the DIP Order, to the extent that any default provision of the DIP Order corresponds to a similar default provision in the DIP Credit Agreement, all notice and cure provisions applicable to such default provisions contained in the DIP Credit Agreement shall also apply to such default provisions under the DIP Order.<br><br>*See* DIP Order ¶ 7. |
| **Priority of Claims and Liens; Collateral**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(i)* | The DIP Loans are being provided on an unsecured basis pursuant to section 364(b) of the Bankruptcy Code.  The DIP Loans shall be *pari passu* in right of payment with unsecured claims and will not be entitled to administrative expense priority of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code.<br><br>*See* DIP Order ¶ 6. |
| **Adequate Protection / Identity of Each Entity with Interest in Cash Collateral**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ii); (b)(1)(B)(i), (iv); Local Rule 4001-2(a)(i)(K) & (P)* | Not applicable. |
| **Debtors' Stipulations**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii); Local Rule 4001-2(a)(i)(B)* | None. |

| Summary of Material Terms | |
|---|---|
| **Waiver or Modification of Automatic Stay**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | Upon five (5) days' written notice to the Debtors, the U.S. Trustee, the Unsecured Creditors Committee, and the FCR, the automatic stay extant under section 362(a) of the Bankruptcy Code shall be, and it hereby is, modified to the extent necessary to permit the Lender to exercise its rights and remedies under the DIP Credit Agreement in accordance with paragraphs 11 and 12 of the DIP Order.<br><br>*See* DIP Order ¶ 10.<br><br>Notwithstanding the occurrence of the Termination Date or anything in the DIP Order, all of the rights, remedies, benefits and protections provided to the Lender under the DIP Order shall survive the Termination Date.  Upon the Termination Date, the principal of and accrued interest and all other amounts owed to the Lender under the DIP Credit Agreement or the DIP Order as of the Termination Date shall be recognized as a non-priority, non-administrative, general unsecured claim against the Borrower for all Obligations and other amounts due and owing under the DIP Credit Agreement and the other DIP Financing Documents, and the Lender shall have all other rights and remedies provided in the DIP Credit Agreement.  No obligation, payment, or transfer under the DIP Credit Agreement or the DIP Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including, without limitation, under sections 502(d), 544, 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.<br><br>*See* DIP Order ¶ 12. |
| **Milestones**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(vi); Local Rule 4001-2(i)(a)(H)* | Section 10 of the DIP Credit Agreement contains customary Events of Default, including the following milestones:<br><br>• A Plan and Disclosure Statement shall not have been filed with the Court on or before June 30, 2024;<br><br>• The DIP Order shall not have been entered by the Court on or before the date that is 45 days after the DIP Motion Date;<br><br>• The hearing on the Disclosure Statement shall not have occurred on or before July 31, 2024;<br><br>• The Court shall not have entered on or before August 5, 2024 an order approving the Disclosure Statement.<br><br>• The Court shall not have entered a Confirmation Order on or before September 30, 2024 (or such later date to which the Lender consents).<br><br>• The Unsecured Creditors Committee and the FCR files a notice with the Court withdrawing from the pending meditation approved by the Court pursuant to the *Joint Stipulation and Agreed Order Appointing Mediator and Governing Mediation Procedures* [Docket No. 538] on or after June 17, 2024.<br><br>*See* DIP Credit Agreement Section 10. |
| **Indemnification**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ix)* | None. |
| **Section 506(c) and Marshaling Waivers** | None. |

| Summary of Material Terms | |
|---|---|
| *Fed. R. Bankr. P. 4001(c)(1)(B)(x); Local Rule 4001-2(a)(i)(C)* | |
| **Liens on Avoidance Actions**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(xi)* | None. |
| **Fees**<br><br>*Fed. R. Bankr. P. 4001(c)(1); Local Rule 4001-2(a)(i)(B)* | None. |
| **Cross-Collateralization**<br><br>*Local Rule 4001-2(a)(i)(N)* | Not applicable. |

19.     BMI engaged in negotiations with the Lender aimed at reducing the cost and increasing the flexibility of the DIP Facility. The Debtors believe that the DIP Credit Agreement, and resulting DIP Facility, are on terms more favorable to the Debtors than would otherwise be available from any other source.

20.     Importantly, the terms of the DIP Credit Agreement and DIP Order have been agreed to by the Unsecured Creditors Committee and the FCR after negotiations with the Debtors and the Lender. As a result of these negotiations, the Lender has agreed (i) to provide the DIP Loans on an unsecured basis and (ii) that any claims the Lender has resulting from the DIP Loans will be *pari passu* in right of payment with unsecured claims and will not be entitled to administrative expense priority.

## BUDGET AND NEED FOR ADDITIONAL LIQUIDITY

21.     BMI and the Lender have agreed on a cash flow budget, which is attached to the DIP Credit Agreement as **Exhibit B** (the "**Approved Budget**"). The budget will be updated upon each approved Budget Amendment Request (as defined in the DIP Credit Agreement) submitted

by BMI in accordance with the terms of the DIP Credit Agreement.  The budget incorporating any Budget Amendment Request shall become the "Approved Budget" for purposes of the DIP Order.

22.    The Approved Budget has been updated to reflect the current status of the Chapter 11 Cases – *e.g.*, continued mediation with the Unsecured Creditors Committee and the FCR, potential litigation between the Debtors and parties in interest, post-Sale activities, and efforts to confirm a chapter 11 plan.  Taken together, the Debtors require funding beyond the aggregate commitments contemplated under the JMB DIP.  Murphy Decl. at ¶ 10.

23.    As reflected in the Murphy Declaration, the Debtors believe the Approved Budget accurately reflects the Debtors' funding requirements from the DIP Effective Date to September 30, 2024 (which represents the estimated date of plan confirmation) and is reasonable and appropriate under the circumstances of the Chapter 11 Cases.  *Id.*

## BASIS FOR RELIEF

### A.    BMI Should Be Authorized to Enter Into the DIP Credit Agreement

24.    Section 364(b) provides that, after notice and a hearing, the court may authorize the debtor to obtain unsecured credit or incur unsecured debt allowable under section 503(b)(1) as an administrative expense of the estate.  *See* 11 U.S.C. § 364(b).

### i.    Entry Into the DIP Credit Agreement Is an Exercise of BMI's Sound Business Judgment

25.    A debtor's decision with respect to a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment" and were "reasonable under the circumstances and in the best interests of TWA and its creditors"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)

15

("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); *Group of Institutional Holdings vs. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943) (deferring to the debtor's business judgment); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

26.     Bankruptcy courts typically defer to a debtor's business judgment on the decision to borrow money unless such decision is arbitrary and capricious.  *See Trans World Airlines*, 163 B.R. 964 at 974; *see also, e.g., In re N Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re Latam Airlines Grp. S.A.*, 2020 WL 5506407 at *27 (Bankr. S.D.N.Y. Sept. 10, 2020) ("Generally, in evaluating the merits of proposed post-petition financing, courts will defer to a debtor's business judgment provided that the financing does not unduly benefit a party in interest at the expense of the estate.").  In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

27.     Moreover, a debtor is permitted to use assets belonging to the estate outside the ordinary course of business after proper notice and hearing.  11 U.S.C. § 363(b).  Courts evaluate a debtor's decision with respect to the use of assets outside the ordinary course of business also

using the business judgment standard.  *See In re Cont'l Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986).  Specifically, for a debtor "to satisfy its fiduciary duty . . . there must be some articulated business justification for . . . selling . . . the property outside the ordinary course of business."  The application of this standard is made on a case-by-case basis and encourages flexibility and discretion.  *In re ASARCO, LLC*, 650 F.3d 593, 601 (5th Cir. 2011).

28.      For the reasons discussed herein, the Debtors submit that BMI's entry into the DIP Credit Agreement is a sound exercise of BMI's business judgment and therefore an appropriate use of estate assets under applicable case law.  The Debtors require immediate access to additional liquidity to fund the Chapter 11 Cases, in order to maximize the value of their estates and to pursue "confirmation of a chapter 11 plan of reorganization under section 524(g) of the Bankruptcy Code."  *See* Final JMB DIP Order ⁋ F(ii).  Absent access to the liquidity provided by the DIP Credit Agreement, "the Debtors and their estates will be immediately and irreparably harmed."  *See id.*

29.      Crucially, the Debtors are in the midst of mediation with their key stakeholders with the goal of reaching consensus.  *See Joint Stipulation and Agreed Order Appointing Mediator and Governing Mediation Procedures* [Docket No. 538].  They cannot continue the mediation or work towards a resolution of the Chapter 11 Cases without access to additional funding.  Losing access to funding at this point in the Chapter 11 Cases would derail the Debtors' reorganization efforts.  Murphy Decl. at ¶ 11.  In contrast, with the New DIP, the Debtors will have the runway to administer the Chapter 11 Cases, allowing the Debtors to continue pursuing their chapter 11 goals, namely a comprehensive resolution of BMI's talc liabilities, for the benefit of Debtors' estates and all stakeholders.  *Id.* at ¶ 12.

30.     The Debtors also submit that, as set forth in the Szlezinger Declaration and Gordon Declaration, the terms of the DIP Credit Agreement, (a) were subject to arms'-length and good faith negotiations between BMI and the Lender, and each of their respective and independent advisors, and (b) are fair and reasonable under the circumstances.  *See* Szlezinger Decl. at ¶ 16; Gordon Decl. at ¶ 12.

31.     As set forth in the Szlezinger Declaration, the New DIP represents the best financing source available to the Debtors.  *See* Szlezinger Decl. at ¶ 13.  In contemplation of the need for additional financing post-Sale,[7] the Debtors' advisors contacted potential third-party lenders, including Pfizer, Inc. and JMB, to develop a sense of whether unsecured or secured financing was a possibility under the circumstances of the Chapter 11 Cases.  As a result of this outreach, the Debtors were not able to locate any third-party willing to provide a loan to the Debtors on an unsecured or secured basis.  Indeed, most of the potential third-party lenders contacted by the Debtors' were only open to a potential financing if it included a guarantee or other form of credit support from MTI (which MTI has no obligation to provide and is unwilling to provide).  *Id.* at ¶ 13.

32.     As compared to the JMB DIP, the New DIP has the following favorable characteristics: (i) the DIP Loans will be provided on an unsecured basis; (ii) there are no financing fees; and (iii) the New DIP has a lower interest rate than the JMB DIP and interest is not due until maturity.  The terms of the New DIP are materially better than the terms of the JMB DIP, which were approved by the Court pursuant to the Final JMB DIP Order.

---

[7]     After receiving bids in connection with the Sale (the "**Bids**") the Debtors identified the potential need for additional financing.

33.     In light of the terms of the New DIP, coupled with the Debtors' prepetition marketing process and the Debtors' efforts to locate an alternative funding source after receiving the Bids, it was made clear that better terms were unattainable.  Indeed, the Lender has agreed that any and all claims it has in respect of the New DIP will be treated as general unsecured claims. Accordingly, the Debtors submit that BMI's entry into the New DIP on the terms described herein, is necessary, prudent, and in the best interest of the Debtors' estates, creditors, and all parties in interest.

ii.     **Entry into the New DIP also Satisfies an Entire Fairness Analysis**

34.     Although the New DIP constitutes a related-party transaction, it should be approved under the business judgment rule.  The New DIP process was overseen by the Debtors' Chief Restructuring Officer, and approved by BMI's independent director, each of whom is unaffiliated with MTI.[8]  *See* Gordon Decl. at ¶ 7.  The Debtors' advisors did discuss the New DIP with the Debtors' full board of directors, which consists of certain officers of MTI.  However, the Debtors ensured that MTI-affiliated board members did not vote on whether BMI should enter into the New DIP.  *Id.*  For the reasons that follow, even if the Court were to apply the heightened "entire fairness" standard to its analysis of the DIP Credit Agreement, the Debtors' actions in reviewing and approving the New DIP satisfy this standard.

35.     The entire fairness standard consists of "two aspects, fair dealing and fair price, both of which must be examined together in resolving the ultimate question of entire fairness." *Rosenblatt v. Getty Oil Co*., 493 A.2d 929, 937 (Del. 1985).  Ordinarily, the party seeking to

---

[8]     Certain members of MTI's management team were designated by BMI's board of directors to assist BMI with the Chapter 11 Cases, including the Sale and debtor-in-possession financing (the "**Designated Employees**").  The Debtors understand that the Designated Employees acted on behalf of the Debtors in evaluating the Debtors' financing options, including the New DIP.

consummate the challenged transaction bears the burden of proving entire fairness.  *See Kahn v. Lynch Commc'n Sys., Inc*., 638 A.2d 1110, 1117 (Del. 1994).  The burden of proving unfairness "shifts . . . entirely" to the challenging party, however, where the challenged transaction was approved by an independent committee of directors.  *Rosenblatt*, 493 A.2d at 937.  Where a controlling shareholder did not dictate the terms of the transaction and an independent negotiator had real bargaining power which was exercised on an arm's-length basis, the burden to prove unfairness falls to the challenging party.  *Kahn*, 638 A.2d at 1117.  Indeed, the business judgment rule is set aside only upon a showing that the debtor's directors were uninformed, grossly negligent, or lacking independence.  *See In re L.A. Dodgers LLC*, 457 B.R. 308, 313; *In re Mid-State Raceway, Inc*., 323 B.R. 40, 58 (Bankr. S.D.N.Y. 2005) ("To overcome the business judgment rule, the entity opposing the decision by the directors must establish that they acted in bad faith or with fraudulent intent.").

36.      Given the transparent and independent process discussed above, there can be no doubt that the Debtors went to great lengths to ensure the fairness of the New DIP.  For example, although MTI is the Debtors' ultimate parent entity, the process for negotiating the New DIP included review, and ultimately approval, by the Debtors' independent director and Chief Restructuring Officer.  The negotiation of the New DIP on BMI's behalf was led and conducted by the Debtors' professionals and outside advisors, and the terms of the DIP Credit Agreement were thoroughly reviewed and ultimately approved by BMI's independent decision makers.  *See* Gordon Decl. at ¶ 7.

37.      In sum, the process that led to the approval of, and entry into, the DIP Credit Agreement was conducted in good faith and with independent oversight.  The terms of the DIP Facility are likewise fair and favorable, and BMI's entry into the DIP Credit Agreement is in the

best interests of the Debtors' and their estates. Accordingly, the BMI's entry into the DIP Credit Agreement satisfies the entire fairness standard to the extent such standard applies.

**B.**      **The Automatic Stay Should Be Modified on a Limited Basis.**

38.      The DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the Debtors and the Lender to commit all acts and take all actions necessary to implement the DIP Credit Agreement and all acts, actions, and transfers contemplated therein. Stay modifications of this kind are typical and customary features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances. Thus, the DIP Credit Agreement should be approved.

**C.**      **BMI Should Be Authorized to Enter Into the Second Amended Shared Services Agreement**

39.      As discussed in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Existing Bank Accounts, Checks, and Business Forms, (B) Authorizing Continuation of Existing Deposit Practices, (C) Approving the Continuation of Certain Ordinary Course Intercompany Transactions, and (D) Granting Related Relief* (the "**Cash Management Motion**") [Docket No. 5], the Debtors engage in various business transactions with MTI and the Debtors' other non-debtor affiliates (collectively, the "**Non-Debtor Affiliates**"). One such intercompany relationship is the shared services arrangement (the "**Shared Services Arrangement**") between MTI, SMI and BMI, which allows BMI to access critical services at reduced costs (the "**Shared Services**"). Provision of the Shared Services is governed by that certain Services Agreement, by and among MTI, SMI, and BMI, dated as of June 19, 2023 and effective as of January 1, 2023, which was subsequently amended on September 28, 2023 (the "**Shared Services Agreement**"). Among other things, the Shared Services include: administrative and operational services, sales

and marketing and research and development services, and general corporate services.  Under the Shared Services Agreement BMI is charged a flat rate of $101,670 per week.

40.     As a result of the Sale, the Debtors no longer require the breadth of Shared Services provided under the Shared Services Agreement.  Accordingly, BMI negotiated an amendment to the Shared Services Agreement (the "**Second Amendment**"), which is attached as **Exhibit A** hereto.  The Second Amendment reduces the scope of the Shared Services to account for the Sale and limited go-forward operations of the Debtors, and reduces the weekly fee paid by BMI to $15,000.  The Shared Services provided under the Second Amendment include, but are not limited to, general business services, executive services, information technology services, and financial services, which are required to maintain the Debtors' continued operations and comply with their administrative and reporting requirements in the Chapter 11 Cases.

41.     Though the Debtors believe that BMI is entitled to enter into the Second Amendment in the ordinary course of business, the Debtors are seeking authority, out of an abundance of caution, to enter into the amendment in the event the Court finds that the Shared Services Arrangement and Second Amendment are outside of the ordinary course of business.

42.     Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to use property of the estate other than in the ordinary course of business after notice and a hearing. Courts have held that there must be some articulated business justification for using, selling, or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b).  *See, e.g.*, *The Dai-Ici Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate . . . courts require the debtor to show that a sound business purpose justifies such actions.").  In the event an order

permitting BMI to enter into the Second Amendment is necessary, the Debtors believe that their business judgment to amend the Shared Services Agreement is sound because, among other reasons, the Second Amendment permits BMI to reduce the scope of Shared Services such that BMI only receives the services required post-Sale.  In addition entry into the Second Amendment will greatly reduce the Shared Services costs by approximately $85,000 a week.  Finally, the Debtors still require provision of the Shared Services to fulfill various financial and business related functions that it has historically received from the Non-Debtor Affiliates.  The Shared Services are integral to the uninterrupted continuation of the Chapter 11 Cases.  Thus, the Debtors submit that BMI's entry into the Second Amendment is in the best interests of the Debtors' estates and the Debtors' creditors.

## EMERGENCY CONSIDERATION

43.     The Debtors have an immediate and critical need to obtain the financing provided pursuant to the New DIP, to, among other things, (i) permit the orderly transition of BMI's talc business post-Sale; (ii) pay expenses of the Chapter 11 Cases; and (iii) for general corporate purposes.  The incurrence of new debt under the New DIP is necessary and vital to the success of the Chapter 11 Cases.  If access to financing is not obtained by the end of May 2024, the Debtors may have insufficient liquidity to continue to prosecute the Chapter 11 Cases, and may be forced to liquidate, which would result in immediate and irreparable harm to the Debtors and their estates and stakeholders.

## WAIVER OF BANKRUPTCY RULES 6004(A) AND 6004(H)

44.     For the reasons described herein regarding the Debtors' lack of liquidity and exigent circumstances, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

45.     Notice of this Motion will be given to:  (a) the U.S. Trustee; (b) counsel to the Unsecured Creditors Committee; (c) counsel to the FCR; (d) counsel to the Lender; (e) the United States Attorney's Office for the Southern District of Texas; (f) the Internal Revenue Service; (g) counsel to MTI; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.  A copy of this Motion is available on (a) this Court's website, www.txs.uscourts.gov, and (b) the website maintained by the Debtors' claims and noticing agent, Stretto, Inc., at https://cases.stretto.com/BMI/.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is required or needed under the circumstances.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request entry of the DIP Order granting the relief

requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  May 14, 2024
        Houston, Texas

Respectfully Submitted,

*/s/ John F. Higgins*
_____

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
Megan Young-John (TX Bar No. 24088700)
Bryan L. Rochelle (TX Bar No. 24107979)
James A. Keefe (TX Bar No. 24122842)
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Email: jhiggins@porterhedges.com
myoung-john@porterhedges.com
brochelle@porterhedges.com
jkeefe@porterhedges.com

-and-

**LATHAM & WATKINS LLP**
Jeffrey E. Bjork (admitted *pro hac vice*)
Kimberly A. Posin (admitted *pro hac vice*)
Shawn P. Hansen (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Email:    jeff.bjork@lw.com
          kim.posin@lw.com
          shawn.hansen@lw.com

Anu Yerramalli (admitted *pro hac vice*)
Jonathan J. Weichselbaum (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Email:    anu.yerramalli@lw.com
          jon.weichselbaum@lw.com

*Counsel for Debtors and Debtors in Possession*

## **CERTIFICATE OF ACCURACY**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Kimberly A. Posin*
Kimberly A. Posin

## **CERTIFICATE OF SERVICE**

I certify that on May 14, 2024, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ John F. Higgins*
John F. Higgins