United States Bankruptcy Court
Southern District of Texas

**ENTERED**

May 21, 2024

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

------------------------------------------------------- x
                                  :   Chapter 11

In re:                        : 

                                  :   Case No. 23-90794 (MI)
BARRETTS MINERALS INC., *et al.*,[1]   : 

                                  :   (Jointly Administered)
            Debtors.           : 

                                  :   **Re: Docket No. 898**
------------------------------------------------------- x

## ORDER (I) AUTHORIZING DEBTORS TO ENTER INTO POST-PETITION FINANCING AGREEMENT AND OBTAIN POST-PETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING DEBTORS TO ENTER INTO SECOND AMENDMENT TO SHARED SERVICES AGREEMENT AND (III) GRANTING RELATED RELIEF

Upon consideration of the motion (the "**Motion**") of Barretts Minerals Inc. and Barretts Ventures Texas LLC (the "**Debtors**"), as debtors and debtors in possession in the above-captioned chapter 11 cases (these "**Chapter 11 Cases**"), for entry of a final order, pursuant to sections 105, 362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 2002-1, 4001-1(b), 4002-1 and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas and the Procedures for Complex Chapter 11 Bankruptcy Cases (together, the "**Local Bankruptcy Rules**") promulgated by the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Court**"), authorizing the Debtors to:

    (i)        enter into the Debtor-in-Possession Credit Agreement (the "**DIP Credit Agreement**"), dated as of May 14, 2024, between Barretts Minerals Inc. ("**BMI**"),

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Barretts Minerals Inc. (8715) and Barretts Ventures Texas LLC (0787). The Debtors' address is 5605 North MacArthur Boulevard, Suite 1000, Irving, Texas 75038.

US-DOCS\150606384.

as borrower, and Minerals Technologies Investments LLC (the "<u>Lender</u>"), as lender;[2]

(ii)    borrow funds up to the maximum aggregate principal amount of $30,000,000 (plus amounts in respect of accrued interest capitalized thereon) and perform their obligations pursuant to the terms and provisions of a delayed draw term loan facility provided under the DIP Credit Agreement and this Order (collectively with the Approved Budget (as defined below), the "**<u>DIP Financing Documents</u>**"), and to use the proceeds of each loan under the DIP Credit Agreement (each, a "**<u>DIP Loan</u>**" and, collectively, the "**<u>DIP Loans</u>**", and the commitment of the Lender to make DIP Loans pursuant to the DIP Credit Agreement, the "**<u>DIP Loan Commitment</u>**") solely to fund the reasonable administrative expenses of these Chapter 11 Cases in compliance with the DIP Financing Documents;

(iii)   modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to permit the Lender to exercise its rights and remedies under the DIP Financing Documents; and

(iv)   enter into the Second Amendment to that certain Shared Services Agreement by and between Minerals Technologies Inc., Specialty Minerals Inc., and Barretts Minerals Inc. attached to the Motion as **<u>Exhibit A</u>** under sections 363 of the Bankruptcy Code (the "**<u>Second Amendment</u>**"),

and the Court having considered the Szlezinger Declaration, the Murphy Declaration, the Gordon Declaration, and any other evidence submitted and arguments made at the hearing on the Motion (the "**<u>Hearing</u>**"); and all objections, if any, to the final relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that approval of the relief requested in the Motion is fair and reasonable and in the best interests of the Debtors and their estates; and it appearing that the relief granted herein in accordance with the Motion is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

---

[2]    Capitalized terms used but not defined in this Order have the meanings given in Section 1.1 of the DIP Credit Agreement.

**THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.      On October 2, 2023 (the "**Petition Date**"), each of the Debtors filed with the Court its petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On October 20, 2023, an official committee of unsecured creditors consisting of seven talc claimants (the "**Committee**") was appointed by the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**").  On January 1, 2024, the U.S. Trustee reconstituted the membership of the Committee.  On November 20, 2023, the Court entered an order appointing Sander L. Esserman as a legal representative for future talc personal injury claimants (the "**FCR**").

B.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief sought herein are sections 105, 362, 363, and 364 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(c), and Local Bankruptcy Rules 2002-1, 4001-1(b), 4002-1 and 9013-1.  Venue of the Chapter 11 Cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      A critical need exists for BMI to enter into the DIP Credit Agreement.  Without availability under the DIP Credit Agreement, the Debtors will not have sufficient liquidity to administer and resolve these Chapter 11 Cases.  Under the circumstances, the Debtors' access to the DIP Loans is vital to executing and resolving these Chapter 11 Cases.  Without access to the

---

[3]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

DIP Loans upon the terms set forth herein, the Debtors and their estates will be immediately and irreparably harmed.

D.      The Debtors are unable to obtain credit without granting to the Lender the rights, benefits, remedies, and protections set forth herein and the DIP Credit Agreement.

E.      The Lender and BMI have indicated a willingness to enter into the financing arrangements contemplated by this Order, subject to the conditions set forth herein and in the DIP Credit Agreement that the validity of the various claims and other protections granted pursuant to this Order and the DIP Financing Documents will not be affected by any subsequent reversal or modification of this Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the DIP Loans.  The Lender has acted in good faith in consenting to and in agreeing to provide the DIP Loans, and the reliance of the Lender on the assurances referred to above is in good faith.

F.      As a condition to providing the DIP Loans, the Lender requires, and BMI has agreed, that all proceeds of the DIP Loans shall be used and/or applied solely for the purposes expressly permitted in, and in a manner consistent with, the Approved Budget (as amended in accordance with the DIP Credit Agreement).  The Debtors prepared and delivered to the Lender the initial itemized cash flow forecast set forth on **Exhibit B** to DIP Credit Agreement, which was approved by the Lender (the "**Initial Approved Budget**", as may be modified by BMI, and approved by the Lender, from time to time in accordance with the terms of this Order and the DIP Credit Agreement, the "**Approved Budget**"), reflecting, on a line item, cumulative and aggregate basis, all of the Loan Party's projected (i) unused availability of the DIP Loan Commitment under the DIP Credit Agreement, (ii) Cash Operating Receipts, (iii) Cash Operating Disbursements, (iv) Net Operating Cash Flow, and (v) Restructuring Items, each on a weekly basis for the period

commencing on May 1, 2024 through and including September 30, 2024.  The Approved Budget is an integral part of this Order, and the Lender is relying, in part, upon BMI's agreement to comply with the Approved Budget in determining to enter into the DIP Credit Agreement and to allow the Debtors' use of proceeds of the DIP Loans in accordance with the terms of this Order and the DIP Credit Agreement.

G.     Notice of the Hearing on the Motion and this Order has been provided to counsel to the Lender, counsel to the Committee, counsel to the FCR, all other parties entitled to notice of the Motion pursuant to Bankruptcy Rule 2002, and the U.S. Trustee.  Such notice was, in the Debtors' belief, the best available under the circumstances.

H.     The post-petition financing arrangements authorized hereunder have been negotiated in good faith and at arm's-length between BMI and the Lender and the terms of such financing arrangements are fair and reasonable under the circumstances, reflect BMI's exercise of prudent business judgment consistent with its fiduciary duties and are supported by reasonably equivalent value and fair consideration.

I.     Sound business reasons have been articulated for entering into the Second Amendment and it is a sound exercise of business judgment to enter into and perform the Second Amendment.  BMI's entry into the Second Amendment is in the best interests of the Debtors' estates and creditors.

J.     The Court concludes that entry of this Order is in the best interest of the Debtors and their estates and creditors as its implementation will, among other things, allow the Debtors to facilitate their chapter 11 goals and maximize the value of their assets and estates.  Therefore, good cause exists for the entry of this Order.

NOW, THEREFORE, on the Motion of the Debtors and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor

**IT IS HEREBY ORDERED AND ADJUDGED THAT**:

1. Omitted.

2. BMI is authorized to enter into the DIP Credit Agreement in substantially the form attached hereto as **Exhibit 1**, and to borrow money and perform its obligations hereunder and thereunder in accordance with, and subject to, the terms of this Order and the DIP Credit Agreement. The DIP Credit Agreement is hereby approved on a final basis in all respects. The DIP Credit Agreement shall constitute a valid and binding obligation of BMI, enforceable against BMI in accordance with its terms.

3. BMI is authorized to enter into the Second Amendment in substantially the form annexed to the Motion, which shall be effective retroactive to April 29, 2024.

4. BMI is authorized to enter into modifications and amendments to the DIP Credit Agreement as may be agreed upon in writing by BMI and the Lender without further notice or approval of the Court; *provided, however*, that such modifications are not materially adverse to the Debtors or their estates. Notice of all modifications materially adverse to the Debtors or their estates shall be subject to approval by the Court and must be served upon counsel to the Committee, the FCR, all parties requesting notice pursuant to Bankruptcy Rule 2002, and the U.S. Trustee. Prior notice of all modifications, whether or not adverse to the Debtors or their estates, must be served upon counsel to the Committee, the FCR, and the U.S. Trustee, on sufficient notice for any such party to request an expedited hearing.

5. From and after the Effective Date through the Termination Date and subject to the terms and conditions of this Order, BMI is hereby authorized to borrow funds pursuant to the terms

and provisions of the DIP Credit Agreement and this Order.  Pursuant to the DIP Credit Agreement, and subject to the terms and conditions thereof and of this Order, BMI is hereby authorized to borrow and the Lender shall be permitted to advance, DIP Loans up to the maximum aggregate principal amount of $30,000,000 (plus amounts in respect of accrued interest capitalized thereon), subject to the terms and conditions (including any conditions precedent to such borrowing) set forth in the DIP Credit Agreement and this Order.  BMI is hereby authorized to use the proceeds of the DIP Loans solely in the manner and for the purposes expressly permitted in the Approved Budget, the DIP Credit Agreement, and this Order.

6.      The DIP Loans are being provided on an unsecured basis pursuant to section 364(b) of the Bankruptcy Code.  The DIP Loans shall be *pari passu* in right of payment with unsecured claims and will not be entitled to administrative expense priority of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code.

7.      All claims granted by this Order are subject to the Carveout.  As used in this Order, "**Carveout**" means (i) the unpaid fees of the clerk of the Court and statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate under 37 U.S.C. § 3717, (ii) from and after the delivery of written notice from the Lender to BMI of the occurrence, and during the pendency, of an Event of Default, the allowed fees and expenses payable under sections 327, 328, 330 and 331 of the Bankruptcy Code to professional persons retained pursuant to an order of the Court by the Debtors, the Committee, and the FCR (collectively, "**Professional Persons**"), in an aggregate amount not to exceed $3,000,000 (plus all such unpaid professional fees and expenses incurred prior to notice of such Event of Default to the extent allowed by order of the Court (whether before or after notice of such Event of Default) and payable pursuant to an order of the Court and incurred in accordance with the DIP Financing Documents), and (iii) the

reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code.  So long as no Event of Default shall have occurred and be continuing, the Debtors shall, subject to the DIP Financing Documents, be permitted to pay compensation and reimbursement of expenses allowed by the Court and payable under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, and the same shall not reduce the Carveout. Notwithstanding anything to the contrary contained in this Order, to the extent that any default provision of this Order corresponds to a similar default provision in the DIP Credit Agreement, all notice and cure provisions applicable to such default provisions contained in the DIP Credit Agreement shall also apply to such default provisions under this Order.

8.     Interest shall accrue on the DIP Loans at the non-default rate of 11% per annum, subject to any provision contained in the DIP Credit Agreement or this Order requiring a higher rate of interest.  Accrued interest on the DIP Loans shall be capitalized on the last Business Day of each calendar quarter, commencing June 30, 2024.  The DIP Loans (including all accrued interest that is capitalized) shall become due and payable and the DIP Loan Commitments shall terminate, as provided herein and in the DIP Credit Agreement.

9.     From and after the Effective Date, BMI shall use the proceeds of the DIP Loans solely as provided in the DIP Credit Agreement.  From and after the Effective Date, the proceeds of the DIP Loans shall not, directly or indirectly, be used to pay expenses of the Debtors or otherwise disbursed except for (i) those expenses and/or disbursements that are permitted under the DIP Credit Agreement, and (ii) compensation and reimbursement of expenses allowed by the Court to attorneys, accountants, financial advisors or other professional persons retained by the Debtors, the Committee, or the FCR, consistent with the DIP Credit Agreement; *provided* that the foregoing shall not be construed as consent to the allowance of any of the amounts referred to in

the preceding clauses (i) or (ii) and shall not affect the right of any party in interest to object to the allowance and payment of such amounts.  No administrative claims, including fees and expenses of professionals, shall be assessed against or attributed to the Lender by reason or on account of it acting as the Lender in accordance with the DIP Credit Agreement or making any loan pursuant to the DIP Credit Agreement, the Motion or this Order.  Except as set forth in the first sentence of this paragraph 9 and the DIP Credit Agreement, the Lender has not consented or agreed to the use of the proceeds of the DIP Loans.

10.     Upon five (5) days' written notice to the Debtors, the U.S. Trustee, the Committee, and the FCR, the automatic stay extant under section 362(a) of the Bankruptcy Code shall be, and it hereby is, modified to the extent necessary to permit the Lender to exercise its rights and remedies under the DIP Credit Agreement in accordance with paragraphs 11 and 12 of this Order.

11.     Notwithstanding anything herein or in the DIP Credit Agreement, other than the Carveout (only to the extent of the unused DIP Loan Commitment Amount), BMI shall no longer be authorized to borrow funds under the DIP Credit Agreement upon the occurrence of a Termination Event.

12.     Notwithstanding the occurrence of the Termination Date or anything herein, all of the rights, remedies, benefits and protections provided to the Lender under this Order shall survive the Termination Date.  Upon the Termination Date, the principal of and accrued interest and all other amounts owed to the Lender under the DIP Credit Agreement or this Order as of the Termination Date shall be recognized as a non-priority, non-administrative, general unsecured claim against the Borrower for all Obligations and other amounts due and owing under the DIP Credit Agreement and the other DIP Financing Documents, and the Lender shall have all other rights and remedies provided in the DIP Credit Agreement.  No obligation, payment, or transfer

under the DIP Credit Agreement or this Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including, without limitation, under sections 502(d), 544, 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.

13.     Notwithstanding anything herein to the contrary, no DIP Loans may be used by the Debtors, the Committee, the FCR, or any other person or entity to assert or prosecute claims, causes of action, objections, contests, or defenses against the Lender (in its capacity as the Lender under the DIP Credit Agreement), other than to enforce the terms of the DIP Credit Agreement or this Order.

14.     If it shall be necessary for the Lender, at any time, to exercise any of its rights and remedies hereunder or under applicable law, the Lender shall provide five (5) Business Days' notice of its election to exercise such remedies to the Debtors, the Committee, the FCR, and the U.S. Trustee and shall thereafter have the right without further order of the Court to exercise such rights and remedies as the Lender shall, in its sole discretion, elect, absent order of the Court to the contrary.  Notwithstanding the foregoing, nothing in this Order shall prejudice or impair the right of any party in interest to object to, or seek to enjoin, the Lender's exercise of any such rights or remedies.

15.     Without limiting the rights of access and information afforded to the Lender under the DIP Credit Agreement, the Debtors shall permit representatives, agents and/or employees of the Lender to have reasonable access to the premises of each Debtor and the records of each Debtor during normal business hours (without unreasonable interference with the proper operation of the business of each Debtor) and shall cooperate, consult with, and provide to such persons all such

non-privileged information as they may reasonably request, all to the extent set forth in the DIP Credit Agreement.

16.     The provisions of this Order shall be binding upon and inure to the benefit of the Lender and the Debtors and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of each Debtor's estate).

17.     Nothing in this Order, the DIP Credit Agreement, or any other document related to the DIP Loans shall in any way be construed or interpreted to impose upon the Lender any liability for any claims arising from the pre-petition or post-petition activities of any Debtor in the operation of its business or in connection with its restructuring effort.

18.     In determining to make any DIP Loan, or in exercising any rights or remedies as and when permitted pursuant to this Order, or the DIP Credit Agreement, the Lender shall not be deemed to be in control of any Debtor or its operations.

19.     Based on the findings set forth in paragraphs E and H of this Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the post-petition financing arrangement contemplated by this Order, in the event any or all of the provisions of this Order are hereafter reversed or modified by a subsequent order of this or any other Court, no such reversal or modification shall affect the authorization and incurring of debt authorized hereby, unless the authorization and incurring of such debt is stayed pending appeal.

20.     The Lender shall not be required to file proofs of claim in the Chapter 11 Cases or any such successor cases (collectively, the "**Successor Cases**") in order to assert claims for payment of the DIP Loans.  The Debtors' acknowledgments and the provisions of this Order, together with the evidence accompanying the Motion and presented at the Hearing, are deemed

sufficient to and do constitute a timely filed proof of claim in respect of such claim arising under the DIP Loans against BMI. Any order entered by the Court establishing a bar date in the Chapter 11 Cases or any Successor Cases shall not apply to the Lender or the DIP Loans.

21.     Notwithstanding anything herein, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, (x) any of the rights of the Lender under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of the Lender to (i) request relief from or modification of the automatic stay extant under section 362 of the Bankruptcy Code, (ii) request conversion of the Chapter 11 Cases to chapter 7, (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans, and (iv) object to the fees and expenses of any retained professionals of the Debtors, the Committee, and the FCR, or (y) any of the rights, claims or privileges (whether legal, equitable or otherwise) of the Lender.

22.     Other than providing the Lender with a non-administrative general unsecured claim against BMI that is *pari passu* with pre-petition general unsecured claims against BMI, nothing in the DIP Financing Documents shall: (i) provide the Lender with any control over any asset of the Debtors' estates, including causes of action; (ii) prejudice, impair, or impede, in any way whatsoever, any unsecured claims, rights and remedies held by any creditor that is not the Lender in these Chapter 11 Cases; or (iii) provide the Lender with any rights to assert any other claim against the Debtors' estates.

23.     Except where expressly indicated in this Order to the contrary, in the event there is any inconsistency between the provisions of this Order and the DIP Credit Agreement, the provisions of this Order shall govern.

24.     The Court shall retain jurisdiction to enforce the provisions of this Order and the DIP Credit Agreement, and this retention of jurisdiction shall survive the confirmation and consummation of each Debtor's chapter 11 plan.

25.     This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.

Signed: May 21, 2024

_____
Marvin Isgur
United States Bankruptcy Judge

## **Exhibit 1**

DIP Credit Agreement

*Execution Version*

BARRETTS MINERALS INC.

————————————

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

dated as of May 14, 2024

————————————

$30,000,000
Credit Facility

————————————

Minerals Technologies Investments LLC, as Lender

Table of Contents

Page

SECTION 1.        DEFINITIONS ...................................................................................1

    1.1.   Defined Terms .........................................................................................1
    1.2.   Other Definitional Provisions ..................................................................8

SECTION 2.        COMMITMENTS ...............................................................................9

    2.1.   Commitments ...........................................................................................9
    2.2.   Commitment Amounts .............................................................................9
    2.3.   Proceeds of DIP Loans ............................................................................9

SECTION 3.        [INTENTIONALLY OMITTED] .......................................................10

SECTION 4.        GENERAL PROVISIONS APPLICABLE TO DIP LOANS .........10

    4.1.   Procedure for DIP Loan Borrowings .....................................................10
    4.2.   Repayments and Prepayments ...............................................................10
    4.3.   Interest Rates and Payment Dates .........................................................10
    4.4.   Computation of Interest .........................................................................10

SECTION 5.        REPRESENTATIONS AND WARRANTIES ..................................11

    5.1.   [Reserved] ..............................................................................................11
    5.2.   [Reserved] ..............................................................................................11
    5.3.   Corporate Existence; Compliance with Law .........................................11
    5.4.   Corporate Power; Authorization ............................................................11
    5.5.   Enforceable Obligations ........................................................................11
    5.6.   No Legal Bar ..........................................................................................12
    5.7.   Accuracy and Completeness of Information ..........................................12

SECTION 6.        CONDITIONS PRECEDENT & SUBSEQUENT ...........................12

    6.1.   Conditions to Initial DIP Loans ............................................................12
    6.2.   Conditions to All DIP Loans .................................................................13

SECTION 7.        AFFIRMATIVE COVENANTS .......................................................13

    7.1.   Financial Statements ..............................................................................13
    7.2.   Certificates; Other Information ..............................................................14
    7.3.   Payment of Obligations .........................................................................14
    7.4.   Conduct of Business and Maintenance of Existence .............................14
    7.5.   Inspection of Property; Books and Records; Discussions ......................15
    7.6.   Notices ...................................................................................................15
    7.7.   Further Assurances .................................................................................15

Table of Contents
Continued

Page

7.8.  Approved Budget ...............................................................................15

SECTION 8.        NEGATIVE COVENANTS ................................................16

8.1.  Indebtedness...............................................................................16
8.2.  Limitation on Liens......................................................................16
8.3.  Limitation on Contingent Obligations .........................................18
8.4.  Prohibition of Fundamental Changes...........................................18
8.5.  Prohibition on Sale of Assets ......................................................18
8.6.  Limitation on Investments, Loans and Advances .........................18
8.7.  DIP Financing .............................................................................18
8.8.  Alteration of Rights of the Lender ...............................................18
8.9.  Chapter 11 Claims.......................................................................18
8.10. Limitation on New Subsidiaries...................................................18
8.11. Use of Proceeds...........................................................................18

SECTION 9.        [INTENTIONALLY OMITTED] .....................................19

SECTION 10.       EVENTS OF DEFAULT .................................................19

SECTION 11.       MISCELLANEOUS ........................................................20

11.1.  Amendments and Waivers ..........................................................20
11.2.  Notices .......................................................................................21
11.3.  No Waiver; Cumulative Remedies ..............................................22
11.4.  Survival of Representations and Warranties................................22
11.5.  Successors and Assigns...............................................................22
11.6.  Counterparts...............................................................................22
11.7.  Severability ................................................................................22
11.8.  Governing Law; No Third-Party Rights ......................................23
11.9.  WAIVER OF JURY TRIAL.........................................................23
11.10. Jurisdiction; Consent to Service of Process ................................23
11.11. [Reserved]..................................................................................24
11.12. Counterparts; Electronic Execution ...........................................24

Exhibits:

Exhibit A – DIP Order
Exhibit B – Approved Budget

## <u>DEBTOR-IN-POSSESSION CREDIT AGREEMENT</u>

DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of May 14, 2024 (as amended, restated or otherwise modified from time to time in accordance with the terms hereof, this "<u>Agreement</u>"), between BARRETTS MINERALS INC., a Delaware corporation, as borrower (the "<u>Borrower</u>" or the "<u>Loan Party</u>"), and MINERALS TECHNOLOGIES INVESTMENTS LLC, a Delaware limited liability company, as lender (the "<u>Lender</u>").

W I T N E S S E T H :

WHEREAS, on October 2, 2023 (the "<u>Petition Date</u>"), the Borrower and its wholly-owned Subsidiary, Barretts Ventures Texas LLC, a Texas limited liability company ("<u>BVT</u>," and together with the Borrower, the "<u>Group Members</u>") commenced voluntary bankruptcy proceedings (collectively, the "<u>Chapter 11 Cases</u>") under Chapter 11 of Title 11 of the United States Code (as amended, the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>"), which are being jointly administered under the lead case filed by the Borrower, Case No. 23-90794 (MI);

WHEREAS, on April 29, 2024, the Borrower sold substantially all of its assets to Elevation NewCo, LLC pursuant to the Order (I) Authorizing (A) the Sale of the Debtors' Assets, Free and Clear of All Liens, Claims, Encumbrances, and Other Interests and (B) the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief [Docket No. 776] (the "<u>Sale</u>");

WHEREAS, proceeds from the Sale were used, in part, to fully satisfy the obligations of the Group Members under that certain *Senior Secured, Super-Priority Debtor-in-Possession Term Loan and Security Agreement* [Docket No. 453];

WHEREAS, the Borrower has requested that the Lender from time to time after the Effective Date (as defined herein) and prior to the Termination Date (as defined herein) make DIP Loans (as defined herein) to the Borrower on the terms and conditions set forth in this Agreement; and

WHEREAS, the Lender is willing, on the terms and conditions hereinafter set forth, to make such DIP Loans to facilitate the administration of the Chapter 11 Cases;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## SECTION 1.  <u>DEFINITIONS</u>

1.1.    <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings:

"<u>Agreement</u>":  as defined in the preamble.

"<u>Approved Budget</u>": as defined in Section 6.1(c).

"Bankruptcy Code":  as defined in the first recital.

"Bankruptcy Court":  as defined in the first recital.

"Borrower":  as defined in the preamble.

"Borrowing":  the making of DIP Loans on any Business Day in accordance with Sections 2 and 4.

"Borrowing Compliance Certificate":  a written certificate signed by an authorized officer of the Borrower stating that, to the best of their knowledge, (a) the proceeds of the DIP Loans to be made in connection with such Borrowing Compliance Certificate shall be used for one of the types of expenditures set forth in Section 2.3 (and not in contravention of Section 8.11), (b) such borrowing of DIP Loans is in compliance with Section 4.1, (c) no Termination Event has occurred and (d) the applicable statements contained in paragraphs (a) and (b) of Section 6.2 are true and correct as at the Borrowing Date.

"Borrowing Date":  any Business Day, specified in a notice pursuant to Section 4.1 as a date on which the Borrower requests that the Lender make DIP Loans hereunder.

"Budget Amendment Request":  as defined in Section 7.2(c).

"Business Day":  a day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by law to be closed.

"BVT":  as defined in the first recital.

"Cash Management Agreement": that certain Amended and Restated Cash Management Agreement, dated as of October 3, 2023, by and among MTI, SMI, and the Borrower.

"Cash Operating Disbursements": disbursements of the type listed under the "Disbursements" category in the Approved Budget; provided that, for the avoidance of doubt, Cash Operating Disbursements shall exclude Restructuring Items.

"Cash Operating Receipts": receipts of the type listed under the "Receipts" line item in the Approved Budget.

"Chapter 11 Cases":  as defined in the first recital.

"Claim":  as defined in section 101(5) of the Bankruptcy Code.

"Confirmation Order":  an order of the Bankruptcy Court confirming a Plan that is in form and substance satisfactory to the Lender and the Borrower in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the prior written consent of the Lender in its reasonable discretion).

"<u>Consummation Date</u>":  with respect to a Plan, the earlier of the date on which (i) the effective date of such Plan occurs or (ii) "substantial consummation" (as defined in Section 1101(2) of the Bankruptcy Code) of such Plan shall have occurred.

"<u>Contingent Obligation</u>":  as to any Person, any obligation of such Person guaranteeing or in effect guaranteeing any Indebtedness, Financing Leases, dividends or other obligations ("<u>primary obligations</u>") of any other Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (d) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; <u>provided</u>, <u>however</u>, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount (based on the maximum reasonably anticipated net liability in respect thereof as determined by the Borrower in good faith) of the primary obligation or portion thereof in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated net liability in respect thereof (assuming such Person is required to perform thereunder) as determined by the Borrower in good faith.

"<u>Contractual Obligation</u>":  as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking to which such Person is a party or by which it or any of the property owned by it is bound.

"<u>Default</u>":  any of the events specified in Section 10, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"<u>DIP Financing Documents</u>":  the collective reference to this Agreement, the DIP Order and each other instrument, document or agreement required to be delivered pursuant hereto or thereto.

"<u>DIP Loan</u>":  as defined in Section 2.1.

"<u>DIP Loan Commitment</u>":  as defined in Section 2.1.

"<u>DIP Loan Commitment Amount</u>":  the lesser of (a) $30,000,000 (as reduced from time to time in accordance with the terms of this Agreement), plus any and all PIK Payment Amount and (b) the amount approved by the Bankruptcy Court pursuant to the DIP Order.

"<u>DIP Motion Date</u>": the date on which the motion is filed for the Bankruptcy Court to approve the DIP Order.

"DIP Order":  an order of the Bankruptcy Court approving this Agreement on a final basis, in the form of Exhibit A attached hereto or otherwise satisfactory to the Lender in its reasonable discretion.

"Disclosure Statement": the disclosure statement relating to the Plan that is in form and substance satisfactory to the Lender and the Borrower in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time with the prior written consent of the Lender in its reasonable discretion).

"Disclosure Statement Approval Date": the date on which the Bankruptcy Court enters an order approving the Disclosure Statement.

"Dollars" and "$":  dollars in lawful currency of the United States of America.

"Effective Date":  the date of entry of the DIP Order.

"Environmental Laws": any and all applicable federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees or other applicable requirements of any Governmental Authority regulating, or imposing liability or standards of conduct concerning environmental protection, regulation, contamination or clean-up matters, as now or may at any time hereafter be in effect, including any applicable provisions of the Clean Water Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Superfund Amendment and Reauthorization Act of 1986, the Emergency Planning and Community Right to Know Act, the Resource Conservation and Recovery Act, the Hazardous Materials Transportation Act, the Clean Air Act, the Clean Water Act, the Occupational Safety and Health Act, the Safe Drinking Water Act, and the Toxic Substances Control Act, together, in each case, with each amendment, supplement or other modification thereto, and the regulations adopted and publications promulgated thereunder and all substitutions therefor.

"Event of Default": any of the events specified in Section 10, provided that any requirement, if any, for the giving of notice, the lapse of time, or both, has been satisfied.

"FCR": as defined in Section 10(r).

"Financing Lease": any lease of property, real or personal, the obligations under which are capitalized on a balance sheet of the Borrower in accordance with GAAP.

"GAAP": generally accepted accounting principles in the United States of America in effect from time to time.

"Governmental Authority":  any nation or government, any state or other political subdivision thereof or any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Group Members": as defined in the first recital.

"Hazardous Materials":  any hazardous materials, hazardous wastes, hazardous, dangerous or toxic substances, wastes, raw materials or materials which include hazardous

constituents, pollutants or contaminants, including any of the foregoing which are defined or regulated as such in or under any Environmental Law, including asbestos, polychlorinated biphenyls, radon, formaldehyde insulation, and gasoline and any other petroleum products (including waste or crude oil or any fraction thereof).

"Indebtedness":  of a Person, at a particular date, (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services, (b) the undrawn face amount of all letters of credit issued for the account of such Person and, without duplication, all drafts drawn thereunder and unpaid reimbursement obligations with respect thereto, (c) all liabilities (other than Lease Obligations) secured by any Lien on any property owned by such Person, even though such Person has not assumed or become liable for the payment thereof, (d) Financing Leases and (e) all indebtedness of such Person arising under acceptance facilities; but, in each case, excluding trade and other accounts payable and accrued expenses payable arising from and after the Petition Date in the ordinary course of business which are not overdue for a period of more than 120 days or, if overdue for more than 120 days, as to which a dispute exists and adequate reserves in conformity with GAAP have been established on the books of such Person.

"Indemnity Agreement": the Amended and Restated Indemnity Agreement, dated as of January 2, 2024, by and among MTI, SMI, and the Borrower.

"Initial Approved Budget" ": as defined in Section 6.1(c).

"Intercompany Agreements": collectively, the Cash Management Agreement, the Services Agreement, the Indemnity Agreement, the Tax Sharing Agreement, and the Intercompany Loan Agreement, and such other agreements entered into between the Group Members and their affiliates after the Effective Date.

"Intercompany Loan Agreement": the Intercompany Loan Agreement, dated as of September 29, 2023, by and between MTI and the Borrower, together with that certain Promissory Note dated as of September 29, 2023, made by the Borrower to MTI.

"Interim First Commitment": the commitment of the Lender to make or otherwise fund DIP Loans under the DIP Order in an aggregate amount not to exceed $15,000,000.

"Interim Second Commitment": the commitment of the Lender to make or otherwise fund DIP Loans under the DIP Order in an aggregate amount not to exceed $20,000,000.

"Lease Obligations":  of the Borrower, as of the date of any determination thereof, the rental commitments (including all fixed, minimum, percentage and additional cost, together with all real property taxes, common area charges, insurance premiums and all maintenance, alteration and repair obligations) of the Borrower, if any, under leases, subleases or licenses for real and/or personal property (net of rental commitments from sub-leases thereof), excluding however, obligations under Financing Leases.

"Lender":  as defined in the preamble.

5

"<u>Lien</u>":  any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any Financing Lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction in respect of any of the foregoing except for the filing of financing statements in connection with Lease Obligations incurred by the Borrower to the extent that such financing statements relate to the property subject to such Lease Obligations).

"<u>Loan Party</u>":  as defined in the preamble.

"<u>Material Adverse Effect</u>": (a) a material adverse change in, or a material adverse effect upon, the business, operations, results of operations, assets, liabilities or financial condition of the Group Members, taken as a whole, or (b) a material adverse effect upon the legality, validity, binding effect or enforceability against the Loan Party of any DIP Financing Document, <u>provided,</u> that for the avoidance of doubt, any claims threatened or asserted against the Loan Party related to the use of talc in the Loan Party's past operations or any final non-appealable court or administrative rulings with respect to such claims shall not, individually or in the aggregate, constitute a Material Adverse Effect.

"<u>Maturity Date</u>":  the earlier of (i) December 31, 2024 (or such later date agreed to by the Lender), (ii) the Consummation Date and (iii) the date the DIP Loans are accelerated in accordance with Section 10.  For the avoidance of doubt, on the Maturity Date, the Lender will automatically have a general unsecured claim against the Borrower for the principal and interest and all other Obligations then due and owing under the DIP Financing Documents.

"<u>Measuring Period</u>":  as defined in Section 7.2(c).

"<u>Mediation</u>":  as defined in Section 10(r).

"<u>MTI</u>":  Minerals Technologies Inc., a Delaware corporation.

"<u>Net Operating Cash Flow</u>": "net operating cash flow" as reflected as a line item in the Approved Budget which shall include Restructuring Items.

"<u>Notice of Borrowing</u>":  as defined in Section 4.1.

"<u>Obligations</u>":  all obligations owing to, and rights of, the Lender pursuant to the DIP Financing Documents, including DIP Loans.

"<u>Permitted Liens</u>":  Liens permitted to exist under Section 8.2.

"<u>Person</u>":  an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"<u>Petition Date</u>":  as defined in the first recital.

"PIK Payment Amount":  as defined in Section 4.3.

"Plan":  a plan of reorganization for one or more Group Members proposed pursuant to Section 1121 et seq. of the Bankruptcy Code that is in form and substance satisfactory to the Lender and the Borrower in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time with the prior written consent of the Lender in its reasonable discretion).

"Plan Filing Date": the date on which a Plan and Disclosure Statement has been filed with the Bankruptcy Court.

"Professional Fees": all unpaid fees and expenses incurred by persons or firms retained by (a) the Group Members pursuant to Sections 327, 328, 329, 330, 331, 363, or 503(b)(4) of the Bankruptcy Code; (b) any committee pursuant to sections 328 or 1103 of the Bankruptcy Code; or (c) any court-appointed legal representative for future claimants; provided that, to the extent that any amount of the foregoing compensation or reimbursement is denied or reduced by the Bankruptcy Court or any other court of competent jurisdiction, such amount shall no longer constitute Professional Fees.

"Repayment Date": as defined in Section 4.3(a).

"Requirement of Law":  as to any Person, the Articles or Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property, or to which such Person or any of its property is subject.

"Reserved DIP Loan":  DIP Loans in the aggregate amount of $5,000,000 made by the Lender to the Borrower in a single borrowing.

"Restructuring Fee Variance": for each Measuring Period, the numerical difference, expressed as a percentage, between (a) actual Professional Fees paid during such Measuring Period and (b) projected Professional Fees to be paid during such Measuring Period, as set forth in the then existing Approved Budget.

"Restructuring Items": disbursements of the type listed under the "Restructuring Items" category in the Approved Budget; provided that, for the avoidance of doubt, Restructuring Items shall include Professional Fees and other expenses paid pursuant to the DIP Order.

"Services Agreement": collectively, (a) the Services Agreement, dated as of June 19, 2021 and effective as of January 1, 2023, by and among MTI, SMI and the Borrower, as amended by the First Amendment to Services Agreement dated as of September 28, 2023, by and among MTI, SMI and the Borrower and as may be further amended and (b) the Services Agreement, dated as of September 28, 2023, by and among MTI, SMI, and the Group Members, as may be amended.

"SMI": Specialty Minerals Inc., a Delaware corporation.

7

"Subsidiary":  as to any Person, any corporation (or other entity) of which shares of stock (or equivalent equity interests) of each class having ordinary voting power (other than stock (or equivalent equity interests) having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation (or other entity) are at the time owned by such Person or by one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person.

"Tax Sharing Agreement":  that certain Tax Sharing Agreement, dated as of September 28, 2023, by and between MTI and the Borrower.

"Termination Date":  the date of occurrence of a Termination Event.

"Termination Event":  each of (i) the date upon which the Borrower receives written notice from Lender of any material non-compliance by the Borrower with any of the terms or provisions of the DIP Order, (ii) any Event of Default shall have occurred and any notice required to cause the DIP Loans to become due and payable shall have been given and (iii) the Maturity Date.

"Unsecured Creditors Committee":  as defined in Section 10(r).

"Variance Report":  as defined in Section 7.2(c).

1.2.    Other Definitional Provisions.  (a) Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meaning when used in any other DIP Financing Document or any certificate or other document made or delivered pursuant hereto.

(b)     As used herein, any other DIP Financing Document and any certificate or other document made or delivered pursuant hereto or thereto, accounting terms relating to the Borrower not defined herein and accounting terms partly defined herein to the extent not defined, shall have the meaning given to them under GAAP.  All computations determining compliance with financial covenants or terms, including definitions used therein, shall be prepared in accordance with GAAP.  If at any time the computations for determining compliance with financial covenants or provisions relating thereto utilize GAAP different than those then being utilized in the financial statements then being delivered to the Lender, such financial statements shall be accompanied by a reconciliation statement with respect to such computations.

(c)     The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified.  The words "include," "includes" and "including" will be deemed to be followed by the phrase "without limitation".

(d)     The meanings given to terms defined herein shall be equally applicable to the singular and plural forms of such terms.

**SECTION 2.  COMMITMENTS**

2.1.    Commitments.  Subject to the terms and conditions of this Agreement (including those contained in Section 6), the Lender agrees that it will, in accordance with Section 4, from time to time on any Business Day occurring during the period commencing on the Effective Date until (but not including) the Termination Date, make loans to the Borrower in the aggregate principal amount requested by the Borrower (each such loan made pursuant to this Section 2.1 being referred to as a "DIP Loan", and collectively as the "DIP Loans", and the commitment of the Lender to make DIP Loans pursuant to this Section 2.1 and Section 2.2(a) being referred to as the "DIP Loan Commitment"); provided, however, that, (i) the Lender shall not be required to make any DIP Loan if, after giving effect thereto, the aggregate outstanding principal amount of all DIP Loans would exceed the DIP Loan Commitment Amount, (ii) prior to the Plan Filing Date, the Lender shall not be required to make DIP Loans that would result in the aggregate principal amount of DIP Loans made by the Lender exceeding the Interim First Commitment and (iii) on and after the Plan Filing Date and before the Disclosure Statement Approval Date, the Lender shall not be required to make DIP Loans that would result in the aggregate principal amount of DIP Loans made by the Lender exceeding the Interim Second Commitment.

Each borrowing of DIP Loans shall be in an aggregate amount equal to $500,000 or increments of $250,000 in excess thereof.

2.2.    Commitment Amounts.

(a)    The Lender agrees, on the terms and conditions set forth herein, to make DIP Loans to the Borrower from time to time on any Business Day in an aggregate amount not to exceed at any time outstanding the DIP Loan Commitment Amount.

(b)    At its option, the Borrower may permanently reduce the DIP Loan Commitment Amount, in whole or in part, upon five (5) Business Days' prior written notice to the Lender.

(c)    The Lender agrees to make the Reserved DIP Loan to the Borrower within ten (10) Business Days of the Effective Date.

2.3.    Proceeds of DIP Loans.

(a)    From and after the Effective Date, the proceeds of the DIP Loans shall be used by the Borrower as set forth in the Approved Budget solely to fund the reasonable administrative expenses of the Chapter 11 Cases.

(b)    Notwithstanding anything to the contrary herein, the Borrower shall not use, or permit BVT to use, any proceeds of the Reserved DIP Loan for administrative expenses of the Chapter 11 Cases until the earlier of (i) the date on which the Borrower, the Unsecured Creditors Committee and the FCR reach an agreement on the terms of a Plan, (ii) the date on which the aggregate DIP Loan Commitments are terminated and the Borrower is no longer able to borrow DIP Loans, or (iii) the date on which the Unsecured Creditors Committee and the FCR files a notice with the Bankruptcy Court withdrawing from the Mediation.

**SECTION 3.  [INTENTIONALLY OMITTED]**

**SECTION 4.  GENERAL PROVISIONS APPLICABLE TO DIP LOANS**

4.1.  <u>Procedure for DIP Loan Borrowings</u>.  The Borrower shall give the Lender irrevocable notice (which notice must be received by the Lender no later than 10:00 a.m., New York City time, six (6) Business Days prior to the requested Borrowing Date) (a "<u>Notice of Borrowing</u>") of each borrowing of DIP Loans.  Except with respect to the calendar month in which the Effective Date occurs, no more than two borrowings of DIP Loans shall be permitted in any calendar month and only one borrowing of DIP Loans shall be permitted on any day.  The Lender shall promptly make available funds equal to the amount of the requested DIP Loan to the Borrower by wire transfer to the account specified in the Notice of Borrowing.

4.2.  <u>Repayments</u>.

(a)  Except as otherwise set forth herein or agreed in any Plan, this Agreement evidences the Borrower's obligations, and no promissory note or proof of claim is required to evidence such obligations.

(b)  All payments to be made by the Borrower on account of principal and interest, during the pendency of the Chapter 11 Case of the Borrower, shall be made in accordance with a confirmed Chapter 11 plan of reorganization, if any, which payment provisions of such plan shall not deviate from the terms of this Agreement without the consent of the Unsecured Creditors Committee and the FCR, which consent shall not be unreasonably withheld, conditioned, or delayed.

4.3.  <u>Interest Rates and Payment Dates</u>.  (a) Subject to Section 4.3(b) hereof, the unpaid principal amount of all DIP Loans shall bear interest at a rate per annum equal to 11.00% for the period from and including the date such DIP Loans are made to, but excluding, the earlier of (x) the date such DIP Loans are paid in full and (y) the date such DIP Loans are converted into a general unsecured claim (such earlier date, the "<u>Repayment Date</u>").

(b)  Upon the occurrence and during the continuation of an Event of Default, all DIP Loans and all other amounts outstanding under this Agreement, shall automatically bear interest at a rate per annum equal to 13.00%, except that the interest rate to apply upon the Repayment Date, and thereafter, will be equal to, but no greater than, the interest to be paid to all general unsecured creditors of the Borrower in a Chapter 11 plan of reorganization, if any.

(c)  Accrued interest on each DIP Loan shall be capitalized on the last Business Day of each calendar quarter commencing June 30, 2024 (each such capitalized amount of accrued interest, a "<u>PIK Payment Amount</u>"); <u>provided</u> that so long as the Borrower is a debtor in a case under the Bankruptcy Code, the DIP Loans shall cease accruing interest on the Repayment Date.

4.4.  <u>Computation of Interest</u>.  Interest in respect of DIP Loans shall be calculated on the basis of a 365- or 366-day year, as applicable, for the actual days elapsed.

10

**SECTION 5.  <u>REPRESENTATIONS AND WARRANTIES</u>**

In order to induce the Lender to enter into this Agreement and to make the DIP Loans, the Loan Party hereby represents and warrants to the Lender, on behalf of itself and on behalf of BVT, as applicable, that:

5.1.    [Reserved].

5.2.    [Reserved].

5.3.    <u>Corporate Existence; Compliance with Law</u>.  Each Group Member, except as it may be affected by the commencement of the Chapter 11 Cases and all events and circumstances associated therewith, (a) is a corporation or limited liability company duly formed, validly existing and in good standing under the laws of its jurisdiction of formation, (b) has full corporate (or equivalent) power and authority and possesses all governmental franchises, licenses, permits, authorizations and approvals necessary to enable it to use its corporate name and to own, lease or otherwise hold its properties and assets and to carry on its business as presently conducted other than such franchises, licenses, permits, authorizations and approvals the lack of which, individually or in the aggregate, would not have a Material Adverse Effect, (c) is duly qualified and in good standing to do business in each jurisdiction in which the nature of its business or the ownership, leasing or holding of its properties makes such qualification necessary, except such jurisdictions where the failure so to qualify would not have a Material Adverse Effect, and (d) is in compliance with all applicable statutes, laws, ordinances, rules, orders and regulations of any Governmental Authority or instrumentality, domestic or foreign, except where noncompliance would not have a Material Adverse Effect.

5.4.    <u>Corporate Power; Authorization</u>.  Subject to any required approval of the Bankruptcy Court to be obtained pursuant to the DIP Order, the Loan Party has corporate (or equivalent) power and authority to make, deliver and perform each of the DIP Financing Documents, and, subject to the approval of the Bankruptcy Court pursuant to the DIP Order, the Borrower has the corporate power and authority and legal right to borrow hereunder.  The Loan Party has taken all necessary corporate (or equivalent) action to authorize the execution, delivery and performance of each of the DIP Financing Documents and the Borrower has taken all necessary corporate action to authorize the borrowings hereunder.  Except for any required approval of the Bankruptcy Court to be obtained pursuant to the DIP Order, no consent or authorization of, or filing with, any Person (including any Governmental Authority) is required in connection with the execution, delivery or performance by the Loan Party, or for the validity or enforceability against the Loan Party, of any DIP Financing Document except for consents, authorizations and filings which have been obtained or made and are in full force and effect and except such consents, authorizations and filings, the failure to obtain or perform which would not have a Material Adverse Effect.

5.5.    <u>Enforceable Obligations</u>.  Each DIP Financing Document delivered on or prior to the date hereof (i) has been duly executed and delivered on behalf of the Loan Party and (ii) subject to any required approval of the Bankruptcy Court to be obtained pursuant to the DIP Order, constitutes the legal, valid and binding obligation of the Loan Party, and is enforceable against the Loan Party in accordance with its terms.

5.6.  <u>No Legal Bar</u>.  Subject to the approval of the Bankruptcy Court pursuant to the DIP Order, the execution, delivery and performance of each DIP Financing Document, the use of the proceeds of the DIP Loans and the transactions contemplated by or in respect of such use of proceeds will not violate any Requirement of Law or any Contractual Obligation applicable to or binding upon any Group Member or any of such Group Member's properties or assets, in any manner which, individually or in the aggregate, (i) would have a Material Adverse Effect on the ability of the Loan Party to perform its obligations under the DIP Financing Documents, (ii) would give rise to any liability on the part of the Lender, or (iii) would have a Material Adverse Effect, and will not result in the creation or imposition of any Lien on any Group Member's properties or assets pursuant to any Requirement of Law applicable to it, as the case may be, or any of its Contractual Obligations.

5.7.  <u>Accuracy and Completeness of Information</u>.  The factual statements contained in the DIP Financing Documents and any other certificates or documents furnished or to be furnished to the Lender from time to time in connection with this Agreement, taken as a whole, do not and will not, to the best knowledge of the Loan Party, as of the date when made, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances in which the same were made, all except as otherwise qualified herein or therein, such knowledge qualification being given only with respect to factual statements made by Persons other than the Loan Party.

**SECTION 6.  <u>CONDITIONS PRECEDENT & SUBSEQUENT</u>**

6.1.  <u>Conditions to Initial DIP Loans</u>.  The obligation of the Lender to make its initial DIP Loan is subject to the satisfaction or waiver pursuant to Section 11.1 immediately prior to or concurrently with the making of such DIP Loan, as the case may be, of the following conditions:

(a)  <u>Agreement</u>.  The Lender shall have received a counterpart of this Agreement duly executed and delivered by a duly authorized officer of the Loan Party.

(b)  <u>DIP Order</u>.  The Lender shall have received a copy of the DIP Order entered by the Bankruptcy Court, and the DIP Order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended.

(c)  <u>Approved Budget</u>.  The Lender shall have received an extended weekly Approved Budget for the period commencing on May 1, 2024 through at least September 30, 2024 that specifies in reasonable detail and separates into line items for each category of receipts or disbursements, (i) all of the Loan Party's projected unused availability of the DIP Loan Commitment under this Agreement and (ii) all of the Group Members' projected (A) Cash Operating Receipts, (B) Cash Operating Disbursements, (C) Net Operating Cash Flow, and (D) "Restructuring Items", each on a weekly basis, and in form and substance reasonably acceptable to the Lender (the "<u>Initial Approved Budget</u>", as may be modified from time to time by a Budget Amendment Request made by the Borrower pursuant to Section 7.2(c), the "<u>Approved Budget</u>"), which such Initial Approved Budget is attached hereto as <u>Exhibit B</u>.

6.2.    Conditions to All DIP Loans.  The obligation of the Lender to make any DIP Loan is subject to the satisfaction of the following conditions precedent on the relevant Borrowing Date:

(a)    Representation and Warranties.  Each of the representations and warranties made in or pursuant to Section 5 or which are contained in any other DIP Financing Document shall be true and correct in all material respects on and as of such Borrowing Date as if made on and as of such date (unless stated to relate to a specific earlier date, in which case, such representations and warranties shall be true and correct in all material respects as of such earlier date).

(b)    No Default or Event of Default.  No Default or Event of Default shall have occurred and be continuing on such Borrowing Date or will occur after giving effect to such DIP Loan.

(c)    Borrowing Compliance Certificate.  The Lender shall have received a Borrowing Compliance Certificate.

(d)    DIP Order.  The DIP Order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended.

(e)    Notice of Borrowing.  The Lender shall have received a Notice of Borrowing from the Borrower.

(f)    Variance Report.  The Lender shall have received from the Loan Party a Variance Report to the extent required to be delivered on or before the making of such DIP Loan, which such Variance Report shall be subject to Section 7.2(c).

(g)    Interim First Commitment.  With respect to any borrowing, the result of which the aggregate DIP Loans exceed the Interim First Commitment, the Plan Filing Date shall have occurred.

(h)    Interim Second Commitment.  With respect to any borrowing, the result of which the aggregate DIP Loans exceed the Interim Second Commitment, the Disclosure Statement Approval Date shall have occurred.

## SECTION 7.  **AFFIRMATIVE COVENANTS**

The Loan Party shall, and shall cause BVT to the extent applicable, so long as the DIP Loan Commitment remains in effect, any DIP Loan remains outstanding and unpaid or any other amount is owing to the Lender under the DIP Financing Documents:

7.1.    Financial Statements.  Furnish to the Lender, no later than 30 days after the end of each calendar month of each year (other than quarterly month-ends, in which case no later than 45 days after the end of such quarterly month-end) (or within such longer period as the Lender may agree to in its reasonable discretion), unaudited cash receipts and disbursements, summary of assets and liabilities and income statement for such calendar month, for the Group

Members.  The information required under this <u>Section 7.1</u> may be satisfied by delivery of the monthly operating reports as filed in the Chapter 11 Cases.

      7.2.   <u>Certificates; Other Information</u>.  Furnish to the Lender:

      (a)   all materials, statements and reports required of the Group Members pursuant to the DIP Order;

      (b)   [reserved];

      (c)   beginning on Wednesday, June 5, 2024, and each Wednesday thereafter (or, to the extent such Wednesday is not a Business Day, the next Business Day thereafter), the Borrower shall deliver to the Lender a variance report (each a "<u>Variance Report</u>") in a form satisfactory to the Lender, for the rolling cumulative four (4) week period ending the prior Friday (each a "<u>Measuring Period</u>") calculating the Restructuring Fee Variance for such Measuring Period.  Each Variance Report shall explain in reasonable detail all material Restructuring Fee Variances and request that the Approved Budget be amended to account for any negative variance included in the Variance Report (each a "<u>Budget Amendment Request</u>").  The Borrower may also from time to time submit a Budget Amendment Request to the Lender, whereby the Borrower may request that the Approved Budget be amended in anticipation of increased future Professional Fees as a result of changes to, and actions taken under or in connection with, the Chapter 11 Cases.  The Lender, in its reasonable discretion, shall have the right to approve or reject any Budget Amendment Request by providing the Borrower specific notice thereof within five (5) Business Days after the delivery by the Borrower of Budget Amendment Request.  To the extent the Lender provides written notice rejecting the Budget Amendment Request within such five (5) Business Day period, the then existing Approved Budget shall continue to constitute the Approved Budget until such time as an update or amendment is approved by the Lender.  In the event the Lender does not provide written notice of its rejection of the Budget Amendment Request within such five (5) Business Day period, the Lender shall be deemed to have approved the Budget Amendment Request.  Upon approval, the prior Approved Budget shall be amended by the Budget Amendment Request and become the Approved Budget;

      (d)   [reserved]; and

      (e)   promptly, such additional financial and other information as the Lender may from time-to-time reasonably request.

      7.3.   <u>Payment of Obligations</u>.  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all of its post-Petition Date obligations and liabilities of whatever nature, except (a) when the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the applicable Loan Party, as the case may be and (b) for delinquent obligations which do not have a Material Adverse Effect.

      7.4.   <u>Conduct of Business and Maintenance of Existence</u>.  Preserve, renew and keep in full force and effect its corporate existence and take all reasonable action to maintain all

rights and privileges necessary or desirable in the normal conduct of its business except for rights and privileges the loss of which would not in the aggregate have a Material Adverse Effect, and except as otherwise permitted hereunder; and comply with all applicable Requirements of Law except to the extent that the failure to comply therewith would not, in the aggregate, have a Material Adverse Effect.

7.5.    <u>Inspection of Property; Books and Records; Discussions</u>.  Keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities which permit financial statements to be prepared in conformity with GAAP and all Requirements of Law; and permit representatives of the Lender upon reasonable notice to visit and make a reasonable inspection of any of its properties and reasonably examine and make abstracts from any of its books and records at any reasonable time and as often as may reasonably be requested upon reasonable notice, and to discuss the business, operations, assets and financial and other condition of the Borrower with officers and employees thereof and with its independent certified public accountants, provided, that all such visits and inspections shall be made in accordance with the standard safety, visit, and inspection procedures of the Group Members and their tenants, as applicable, and no such visit or inspection shall unreasonably interfere with the normal business operation of the Group Members and their tenants, and provided, further, that absent the existence of an Event of Default, the Lender shall provide the Group Members with reasonable prior notice before any such inspection.

7.6.    <u>Notices</u>.  Promptly give notice to the Lender:

(a)    of the occurrence of any Default or Event of Default then known to any Group Member; and

(b)    of a Material Adverse Effect arising after the Effective Date known to any Group Member.

Each notice pursuant to this Section 7.6 shall be accompanied by a statement of an authorized officer or director setting forth details of the occurrence referred to therein and (in the cases of clause (a)) stating what action the applicable Group Member proposes to take with respect thereto.

7.7.    <u>Further Assurances</u>.  Notwithstanding anything to the contrary contained in this Agreement, execute any and all further documents, agreements and instruments, and take all such further actions that may be required under any applicable law, or that the Lender may reasonably request, in order to comply with its obligations under and to effectuate the transactions contemplated by this Agreement and the DIP Order, all at the expense of the Loan Party.

7.8.    <u>Approved Budget</u>.  The Group Members shall comply with the Approved Budget (as updated and supplemented in accordance with this Agreement).

**SECTION 8.  <u>NEGATIVE COVENANTS</u>**

The Loan Party shall not, and shall cause BVT to not, to the extent applicable, directly or indirectly, so long as the DIP Loan Commitment remains in effect or any DIP Loan remains outstanding and unpaid or any other amount is owing to the Lender hereunder (it being understood that each of the permitted exceptions to each of the covenants in this Section 8 is in addition to, and not overlapping with, any other of such permitted exceptions except to the extent expressly provided):

8.1.  <u>Indebtedness</u>.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)  Indebtedness outstanding on the Effective Date;

(b)  Indebtedness in connection with the DIP Loans, the DIP Order and this Agreement;

(c)  obligations under any cash management agreement and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements incurred in the ordinary course of business including under the Cash Management Agreement;

(d)  unsecured Indebtedness consisting of the financing of insurance premiums incurred in the ordinary course of business;

(e)  all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in <u>clauses (a)</u> through <u>(d)</u> above;

(f)  intercompany indebtedness of the Group Members incurred in the ordinary course of business, not to exceed $1,500,000;

(g)  guarantees with respect to Indebtedness permitted under this <u>Section 8.1</u>; and

(h)  obligations under any Intercompany Agreement (other than the Intercompany Loan Agreement) in accordance with the terms thereof.

8.2.  <u>Limitation on Liens</u>.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except:

(a)  Liens for taxes, assessments or other governmental charges not yet due or which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the applicable Group Member in accordance with GAAP;

16

(b)      carriers', warehousemen's, mechanics', landlords', materialmen's, repairmen's or other similar Liens arising in the ordinary course of business in respect of obligations which are not yet due or which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the applicable Group Member in accordance with GAAP;

(c)      Liens in connection with workmen's compensation, unemployment insurance and other similar programs and legislation;

(d)      Liens to secure the performance of bids, tenders, trade or government contracts (other than for borrowed money), leases, licenses, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)      easements (including reciprocal easement agreements), rights-of-way, building, zoning and similar restrictions (excluding any non-conforming use, variance or exception without the Lender's consent in its sole discretion), utility agreements, covenants, reservations, minor encroachments, charges, servitudes and other similar Liens, encumbrances or minor title defects incurred, or leases or subleases granted to others (without any right of first refusal or option to purchase), in the ordinary course of business, which do not and are not reasonably anticipated to interfere with or adversely affect in any material respect the present or continued ordinary conduct of the business of any Group Member on the property in question or the rebuilding or restoration of the buildings or improvements located thereon;

(f)      bankers' liens arising by operation of law;

(g)      Liens on equipment arising from precautionary UCC financing statements regarding operating leases of equipment;

(h)      Liens securing judgments for the payment of money (or appeal or other surety bonds relating to such judgments) in existence for less than thirty (30) days after the entry thereof or with respect to which execution has been stayed and which do not constitute an Event of Default;

(i)      Liens that are contractual rights of setoff relating to (i) pooled deposit or sweep accounts of the Group Members to permit satisfaction of overdraft or similar obligations or (ii) the Intercompany Agreements, in each case, incurred in the ordinary course of business of the Group Members;

(j)      Liens on insurance policies and the proceeds thereof solely securing the financing of the premiums with respect thereto;

(k)      any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Group Members, individually, or taken as a whole; and

(l)      Liens existing on the Effective Date.

8.3.     <u>Limitation on Contingent Obligations</u>.  Create, incur, assume or suffer to exist any Contingent Obligation except Contingent Obligations existing on the Effective Date or otherwise permitted under Section 8.1.

8.4.     <u>Prohibition of Fundamental Changes</u>.  Other than in connection with any Chapter 11 plan of reorganization or liquidation, enter into any merger or consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or reclassify its equity interests (including by dividing into one or more series) or engage in any type of business other than of the same general type now conducted by it.

8.5.     <u>Prohibition on Sale of Assets</u>. Except by order of the Bankruptcy Court, convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets (including, without limitation, tax benefits, receivables and leasehold interests), whether now owned or hereafter acquired.

8.6.     <u>Limitation on Investments, Loans and Advances</u>.  Make any advance, loan, extension of credit or capital contribution to, or purchase any stock, bonds, notes, debentures or other securities of, or make any other investment in (including, without limitation, any acquisition of all or any substantial portion of the assets, and any acquisition of a business or a product line, of other companies), any Person, except (i) each Group Member may invest in, acquire and hold cash equivalents and may make all payments to fund the reasonable administrative expenses of the Chapter 11 Cases (and the Borrower may make investments in BVT for purposes of BVT making such payments to the extent applicable) and (ii) investments existing as of the Effective Date.

8.7.     <u>DIP Financing</u>.  Incur or apply to the Bankruptcy Court for authority to incur, or suffer to exist, any (i) indebtedness having the priority afforded by section 364(c) or (d) of the Bankruptcy Code or (ii) obligation to make adequate protection payments, or otherwise provide adequate protection, other than (A) as contemplated by the DIP Order or (B) as approved by the Lender.

8.8.     <u>Alteration of Rights of the Lender</u>.  Limit, affect or modify, or apply to the Bankruptcy Court to limit, affect or modify any of the Lender's rights with respect to the Obligations, pursuant to any Plan or otherwise, other than with the Lender's express prior written consent.

8.9.     <u>Chapter 11 Claims</u>.  Except for the Carveout (as defined in the DIP Order), apply to the Bankruptcy Court for the authority to incur, create, assume, suffer or permit any claim, Lien or encumbrance (other than Permitted Liens) against any Group Member or any of its assets in the Chapter 11 Cases to be senior to the claims of the Lender granted and arising hereunder and under the DIP Order.

8.10.    <u>Limitation on New Subsidiaries</u>.  Organize, form, create or acquire any new Subsidiary.

8.11.    <u>Use of Proceeds</u>.  Use the DIP Loans or the proceeds thereof for any purpose other than to fund payments related to the: (a) working capital and other general corporate purposes of the Group Members; and (b) the payment of Professional Fees and

bankruptcy-related expenses, in each case, substantially in compliance with the Approved Budget; <u>provided</u>, that no proceeds of the DIP Loans shall be used for the pursuit of litigation against the Lender, solely in its capacity as a Lender under this Agreement.

**SECTION 9.  [INTENTIONALLY OMITTED]**

**SECTION 10.        EVENTS OF DEFAULT**

Upon the occurrence and during the continuation of any of the following events:

(a)      [Reserved];

(b)      Any representation or warranty made or deemed made by any Group Member in any DIP Financing Document shall prove to have been incorrect in any material respect on or as of the date made or deemed made;

(c)      Any Group Member shall default in the observance or the performance of Section 2.3 hereunder, Section 7.6 hereunder or any covenant contained in Section 8 hereunder or shall default in the observance or performance of any other agreement, obligation or restriction contained in any DIP Financing Document and such default shall continue for more than 15 days after written notice thereof;

(d)      [Reserved];

(e)      The Bankruptcy Court shall enter an order with respect to any Group Member dismissing its Chapter 11 Case or converting it to a case under Chapter 7 of the Bankruptcy Code, or appointing a trustee in its Chapter 11 Case or appointing a responsible officer or an examiner with enlarged powers relating to the operation of any Group Member's business (beyond those set forth in Sections 1106(a)(3) or (4)) or investigation of Lender under Bankruptcy Code Section 1106(b);

(f)      [Reserved];

(g)      An order of the Bankruptcy Court shall be entered in the Chapter 11 Cases amending, supplementing, staying, vacating or otherwise modifying the DIP Order in a manner not acceptable to the Lender, or any Group Member shall apply for authority to do so;

(h)      Any Group Member shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Group Member) any other Person's opposition of any motion made in the Bankruptcy Court by the Lender seeking confirmation of the amount of the Lender's claim;

(i)      [Reserved];

(j)      [Reserved];

19

(k)      [Reserved];

(l)      A Plan and Disclosure Statement shall not have been filed with the Bankruptcy Court on or before June 30, 2024;

(m)      The DIP Order shall not have been entered by the Bankruptcy Court on or before the date that is 45 days after the DIP Motion Date;

(n)      From and after the date of entry thereof, the DIP Order shall cease to be in full force and effect (or shall have been vacated, stayed, reversed, modified or amended), in each case without the consent of the Lender;

(o)      The hearing on the Disclosure Statement shall not have occurred on or before July 31, 2024;

(p)      The Bankruptcy Court shall not have entered on or before August 5, 2024 an order approving the Disclosure Statement;

(q)      The Bankruptcy Court shall not have entered a Confirmation Order on or before September 30, 2024 (or such later date to which Lender consents);

(r)      The official committee of unsecured creditors (the "Unsecured Creditors Committee") and the legal representative for future talc personal injury claimants (the "FCR") files a notice with the Bankruptcy Court withdrawing from the pending mediation approved by the Bankruptcy Court pursuant to the *Joint Stipulation and Agreed Order Appointing Mediator and Governing Mediation Procedures* [Docket No. 538] (the "Mediation") on or after June 17, 2024; or

(s)      Any DIP Financing Document shall cease, for any reason, to be in full force and effect or the Loan Party shall so assert in writing;

then, and in any such event, so long as any such Event of Default shall be continuing, either or both of the following actions may be taken:  (i) the Lender may by notice to the Borrower, declare the DIP Loan Commitment to be terminated forthwith, whereupon the Lender's DIP Loan Commitment shall immediately terminate; and (ii) the Lender may, by notice of default to the Borrower, declare all or a portion of the DIP Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement to be due and payable forthwith, whereupon the Lender shall have a non-priority, non-administrative, general unsecured claim against the Borrower for all Obligations and other amounts due and owing under this Agreement and the other DIP Financing Documents. Except as expressly provided above in this Section 10, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

## SECTION 11.      **MISCELLANEOUS**

11.1.  Amendments and Waivers.  No DIP Financing Document nor any terms thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 11.1.  The Lender and the Borrower may, from time to time, enter into written amendments, supplements or modifications hereto for the purpose of adding any provisions to

any DIP Financing Document (other than any DIP Order) in which they are parties or changing in any manner the rights of the Lender or of the Borrower or waiving, on such terms and conditions as the Lender may specify in such instrument, any of the requirements of any such DIP Financing Document or any Default or Event of Default and its consequences; provided, however, that no such amendment, supplement or modification that is adverse to any Group Member or its bankruptcy estate shall be effective absent approval of the Bankruptcy Court.

Any such waiver and any such amendment, supplement or modification described in this Section 11.1 shall be binding upon the Borrower and the Lender.  In the case of any waiver, the Borrower and the Lender shall be restored to their former position and rights hereunder and under the outstanding DIP Loans, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

     11.2.   Notices.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing, and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, overnight courier service, mailed by certified or registered mail or sent by email, as follows, or to such other address as may be hereafter notified by such respective parties hereto:

|  |  |
|---|---|
| The Borrower: | Barretts Minerals Inc.<br>5605 North MacArthur Boulevard<br>Suite 1000, PMB 139<br>Irving, TX 75038<br>Attn: David Gordon, Chief Restructuring Officer<br>Telephone:     (415) 738-8282<br>Email: dgordon@djoservicesllc.com |
| With a copy to: | Latham & Watkins LLP<br>355 South Grand Avenue, Suite 100<br>Los Angeles, CA 90071<br>Attn: Kimberly A. Posin; Shawn Hansen<br>Telephone: (213) 485-1234<br>Email: kim.posin@lw.com;<br>shawn.hansen@lw.com |
| The Lender: | Minerals Technologies Investments LLC<br>c/o Minerals Technologies Inc.<br>622 Third Avenue<br>New York, NY 10017<br>Attn:   General Counsel<br>Telephone:     212-878-1800<br>Email: timothy.jordan@mineralstech.com |
| With a copy to: | Hughes Hubbard & Reed LLP<br>1 Battery Park Plaza |

New York, NY 10004
Attn: Christopher Kiplok; Erin Diers; Steven
Greene
Email:
christopher.kiplok@hugheshubbard.com;
erin.diers@hugheshubbard.com;
steven.greene@hugheshubbard.com

provided that any notice, request or demand to or upon the Lender pursuant to Section 4.1 shall
not be effective until actually received.

11.3.   No Waiver; Cumulative Remedies.  No failure to exercise and no delay in
exercising, on the part of the Lender, any right, remedy, power or privilege hereunder, shall
operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power
or privilege hereunder preclude any other or further exercise thereof or the exercise of any other
right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided
are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

11.4.   Survival of Representations and Warranties.  All representations and
warranties made hereunder and in any document, certificate or statement delivered pursuant
hereto or in connection herewith shall survive the execution and delivery of this Agreement.

11.5.   Successors and Assigns.  This Agreement shall be binding upon and inure
to the benefit of the Loan Party and the Lender, and their respective successors and assigns,
except that, absent an order from the Bankruptcy Court, neither the Loan Party nor the Lender
may assign or transfer any of its rights or obligations under this Agreement without the prior
written consent of the other parties hereto (provided, that, the Lender shall be permitted to make
any such assignment or transfer to one or more of its affiliates without any such consent).  Any
purported assignment or transfer in contravention of the preceding sentence shall be *ab initio* null
and void.

11.6.   Counterparts.  This Agreement may be executed by one or more of the
parties to this Agreement on any number of separate counterparts and all of said counterparts
taken together shall be deemed to constitute one and the same instrument.  A set of the copies of
this Agreement signed by all the parties shall be lodged with the Loan Party and the Lender.
This Agreement shall become effective with respect to the Loan Party and the Lender when the
Loan Party and the Lender shall have executed this Agreement and upon entry of the DIP Order.

11.7.   Severability.  In the event any one or more of the provisions contained in
this Agreement or in any other DIP Financing Document should be held invalid, illegal or
unenforceable in any respect, the validity, legality and enforceability of the remaining provisions
contained herein and therein shall not in any way be affected or impaired thereby.  The parties
shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable
provisions with valid provisions the economic effect of which comes as close as possible to that
of the invalid, illegal or unenforceable provisions.

11.8.    Governing Law; No Third-Party Rights.  This Agreement and the rights and obligations of the parties under this Agreement, including the DIP Loans, shall be governed by, and construed and interpreted in accordance with, the internal law of the State of New York, without reference to principles of conflict of laws, except to the extent governed by the Bankruptcy Code.  This Agreement is solely for the benefit of the parties hereto and their respective successors, and, except as expressly set forth in Section 11.1 and Section 11.5, no other Persons shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.

11.9.    WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER DIP FINANCING DOCUMENTS.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DIP FINANCING DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.9.

11.10.    Jurisdiction; Consent to Service of Process.  Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court, and if the Bankruptcy Court does not have (or abstains from) jurisdiction, non-exclusive jurisdiction of any New York State court or federal court of the United State of America sitting in the borough of Manhattan in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof (collectively, "New York Courts"), in any action or proceeding arising out of or relating to this Agreement or the other DIP Financing Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding shall be heard and determined in the Bankruptcy Court (or, as applicable, a New York Court).  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other DIP Financing Documents in the courts of any jurisdiction, except that the Loan Party agrees that (i) it will not bring any such action or proceeding in any court other than the Bankruptcy Court, and (ii) in any such action or proceeding brought against the Loan Party in any other court, it will not assert any cross-claim, counterclaim or set-off, or seek any other affirmative relief, except to the extent that the failure to assert the same will preclude the Loan Party from asserting or seeking the same in the Bankruptcy Court.  Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other DIP Financing Documents in the Bankruptcy Court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent

permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

11.11.  [Reserved]

11.12.  Counterparts; Electronic Execution.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by facsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other DIP Financing Document *mutatis mutandis*.

[SIGNATURE PAGE FOLLOWS]

24

**<u>Exhibit A</u>**

DIP Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

```
------------------------------------------------------- x
                                                        :    Chapter 11
In re:                                                  :
                                                        :    Case No. 23-90794 (MI)
BARRETTS MINERALS INC., et al.,¹                        :
                                                        :    (Jointly Administered)
                Debtors.                                :
                                                        :    Re: Docket No. [_]
------------------------------------------------------- x
```

**ORDER (I) AUTHORIZING DEBTORS TO ENTER INTO POST-PETITION**
**FINANCING AGREEMENT AND OBTAIN POST-PETITION**
**FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE,**
**(II) AUTHORIZING DEBTORS TO ENTER INTO SECOND AMENDMENT TO**
**SHARED SERVICES AGREEMENT AND (III) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "**Motion**") of Barretts Minerals Inc. and Barretts

Ventures Texas LLC (the "**Debtors**"), as debtors and debtors in possession in the above-captioned

chapter 11 cases (these "**Chapter 11 Cases**"), for entry of a final order, pursuant to sections 105,

362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy**

**Code**"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy**

**Rules**"), Rules 2002-1, 4001-1(b), 4002-1 and 9013-1 of the Bankruptcy Local Rules of the United

States Bankruptcy Court for the Southern District of Texas and the Procedures for Complex

Chapter 11 Bankruptcy Cases (together, the "**Local Bankruptcy Rules**") promulgated by the

United States Bankruptcy Court for the Southern District of Texas, Houston Division

(the "**Court**"), authorizing the Debtors to:

(i)        enter into the Debtor-in-Possession Credit Agreement (the "**DIP Credit**
**Agreement**"), dated as of May 14, 2024, between Barretts Minerals Inc. ("**BMI**"),

---

¹    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
Barretts Minerals Inc. (8715) and Barretts Ventures Texas LLC (0787).  The Debtors' address is 5605 North
MacArthur Boulevard, Suite 1000, Irving, Texas 75038.

1

as borrower, and Minerals Technologies Investments LLC (the "<u>Lender</u>"), as lender;[2]

(ii)    borrow funds up to the maximum aggregate principal amount of $30,000,000 (plus amounts in respect of accrued interest capitalized thereon) and perform their obligations pursuant to the terms and provisions of a delayed draw term loan facility provided under the DIP Credit Agreement and this Order (collectively with the Approved Budget (as defined below), the "**<u>DIP Financing Documents</u>**"), and to use the proceeds of each loan under the DIP Credit Agreement (each, a "**<u>DIP Loan</u>**" and, collectively, the "**<u>DIP Loans</u>**", and the commitment of the Lender to make DIP Loans pursuant to the DIP Credit Agreement, the "**<u>DIP Loan Commitment</u>**") solely to fund the reasonable administrative expenses of these Chapter 11 Cases in compliance with the DIP Financing Documents;

(iii)    modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to permit the Lender to exercise its rights and remedies under the DIP Financing Documents; and

(iv)    enter into the Second Amendment to that certain Shared Services Agreement by and between Minerals Technologies Inc., Specialty Minerals Inc., and Barretts Minerals Inc. attached to the Motion as **<u>Exhibit A</u>** under sections 363 of the Bankruptcy Code (the "**<u>Second Amendment</u>**"),

and the Court having considered the Szlezinger Declaration, the Murphy Declaration, the Gordon Declaration, and any other evidence submitted and arguments made at the hearing on the Motion (the "**<u>Hearing</u>**"); and all objections, if any, to the final relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that approval of the relief requested in the Motion is fair and reasonable and in the best interests of the Debtors and their estates; and it appearing that the relief granted herein in accordance with the Motion is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

---

[2]    Capitalized terms used but not defined in this Order have the meanings given in Section 1.1 of the DIP Credit Agreement.

**THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.      On October 2, 2023 (the "**Petition Date**"), each of the Debtors filed with the Court its petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On October 20, 2023, an official committee of unsecured creditors consisting of seven talc claimants (the "**Committee**") was appointed by the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**").  On January 1, 2024, the U.S. Trustee reconstituted the membership of the Committee.  On November 20, 2023, the Court entered an order appointing Sander L. Esserman as a legal representative for future talc personal injury claimants (the "**FCR**").

B.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief sought herein are sections 105, 362, 363, and 364 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(c), and Local Bankruptcy Rules 2002-1, 4001-1(b), 4002-1 and 9013-1.  Venue of the Chapter 11 Cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      A critical need exists for BMI to enter into the DIP Credit Agreement.  Without availability under the DIP Credit Agreement, the Debtors will not have sufficient liquidity to administer and resolve these Chapter 11 Cases.  Under the circumstances, the Debtors' access to the DIP Loans is vital to executing and resolving these Chapter 11 Cases.  Without access to the

---

[3]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

DIP Loans upon the terms set forth herein, the Debtors and their estates will be immediately and irreparably harmed.

D.     The Debtors are unable to obtain credit without granting to the Lender the rights, benefits, remedies, and protections set forth herein and the DIP Credit Agreement.

E.     The Lender and BMI have indicated a willingness to enter into the financing arrangements contemplated by this Order, subject to the conditions set forth herein and in the DIP Credit Agreement that the validity of the various claims and other protections granted pursuant to this Order and the DIP Financing Documents will not be affected by any subsequent reversal or modification of this Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the DIP Loans.  The Lender has acted in good faith in consenting to and in agreeing to provide the DIP Loans, and the reliance of the Lender on the assurances referred to above is in good faith.

F.     As a condition to providing the DIP Loans, the Lender requires, and BMI has agreed, that all proceeds of the DIP Loans shall be used and/or applied solely for the purposes expressly permitted in, and in a manner consistent with, the Approved Budget (as amended in accordance with the DIP Credit Agreement).  The Debtors prepared and delivered to the Lender the initial itemized cash flow forecast set forth on **Exhibit B** to DIP Credit Agreement, which was approved by the Lender (the "**Initial Approved Budget**", as may be modified by BMI, and approved by the Lender, from time to time in accordance with the terms of this Order and the DIP Credit Agreement, the "**Approved Budget**"), reflecting, on a line item, cumulative and aggregate basis, all of the Loan Party's projected (i) unused availability of the DIP Loan Commitment under the DIP Credit Agreement, (ii) Cash Operating Receipts, (iii) Cash Operating Disbursements, (iv) Net Operating Cash Flow, and (v) Restructuring Items, each on a weekly basis for the period

commencing on May 1, 2024 through and including September 30, 2024.  The Approved Budget is an integral part of this Order, and the Lender is relying, in part, upon BMI's agreement to comply with the Approved Budget in determining to enter into the DIP Credit Agreement and to allow the Debtors' use of proceeds of the DIP Loans in accordance with the terms of this Order and the DIP Credit Agreement.

G.     Notice of the Hearing on the Motion and this Order has been provided to counsel to the Lender, counsel to the Committee, counsel to the FCR, all other parties entitled to notice of the Motion pursuant to Bankruptcy Rule 2002, and the U.S. Trustee.  Such notice was, in the Debtors' belief, the best available under the circumstances.

H.     The post-petition financing arrangements authorized hereunder have been negotiated in good faith and at arm's-length between BMI and the Lender and the terms of such financing arrangements are fair and reasonable under the circumstances, reflect BMI's exercise of prudent business judgment consistent with its fiduciary duties and are supported by reasonably equivalent value and fair consideration.

I.     Sound business reasons have been articulated for entering into the Second Amendment and it is a sound exercise of business judgment to enter into and perform the Second Amendment.  BMI's entry into the Second Amendment is in the best interests of the Debtors' estates and creditors.

J.     The Court concludes that entry of this Order is in the best interest of the Debtors and their estates and creditors as its implementation will, among other things, allow the Debtors to facilitate their chapter 11 goals and maximize the value of their assets and estates.  Therefore, good cause exists for the entry of this Order.

NOW, THEREFORE, on the Motion of the Debtors and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor

**IT IS HEREBY ORDERED AND ADJUDGED THAT**:

1.      The Motion is GRANTED as provided herein.

2.      BMI is authorized to enter into the DIP Credit Agreement in substantially the form attached hereto as **Exhibit 1**, and to borrow money and perform its obligations hereunder and thereunder in accordance with, and subject to, the terms of this Order and the DIP Credit Agreement.  The DIP Credit Agreement is hereby approved on a final basis in all respects.  The DIP Credit Agreement shall constitute a valid and binding obligation of BMI, enforceable against BMI in accordance with its terms.

3.      BMI is authorized to enter into the Second Amendment in substantially the form annexed to the Motion, which shall be effective retroactive to April 29, 2024.

4.      BMI is authorized to enter into modifications and amendments to the DIP Credit Agreement as may be agreed upon in writing by BMI and the Lender without further notice or approval of the Court; *provided, however*, that such modifications are not materially adverse to the Debtors or their estates.  Notice of all modifications materially adverse to the Debtors or their estates shall be subject to approval by the Court and must be served upon counsel to the Committee, the FCR, all parties requesting notice pursuant to Bankruptcy Rule 2002, and the U.S. Trustee.  Prior notice of all modifications, whether or not adverse to the Debtors or their estates, must be served upon counsel to the Committee, the FCR, and the U.S. Trustee, on sufficient notice for any such party to request an expedited hearing.

5.      From and after the Effective Date through the Termination Date and subject to the terms and conditions of this Order, BMI is hereby authorized to borrow funds pursuant to the terms

and provisions of the DIP Credit Agreement and this Order. Pursuant to the DIP Credit Agreement, and subject to the terms and conditions thereof and of this Order, BMI is hereby authorized to borrow and the Lender shall be permitted to advance, DIP Loans up to the maximum aggregate principal amount of $30,000,000 (plus amounts in respect of accrued interest capitalized thereon), subject to the terms and conditions (including any conditions precedent to such borrowing) set forth in the DIP Credit Agreement and this Order. BMI is hereby authorized to use the proceeds of the DIP Loans solely in the manner and for the purposes expressly permitted in the Approved Budget, the DIP Credit Agreement, and this Order.

6.      The DIP Loans are being provided on an unsecured basis pursuant to section 364(b) of the Bankruptcy Code. The DIP Loans shall be *pari passu* in right of payment with unsecured claims and will not be entitled to administrative expense priority of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code.

7.      All claims granted by this Order are subject to the Carveout. As used in this Order, "**Carveout**" means (i) the unpaid fees of the clerk of the Court and statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate under 37 U.S.C. § 3717, (ii) from and after the delivery of written notice from the Lender to BMI of the occurrence, and during the pendency, of an Event of Default, the allowed fees and expenses payable under sections 327, 328, 330 and 331 of the Bankruptcy Code to professional persons retained pursuant to an order of the Court by the Debtors, the Committee, and the FCR (collectively, "**Professional Persons**"), in an aggregate amount not to exceed $3,000,000 (plus all such unpaid professional fees and expenses incurred prior to notice of such Event of Default to the extent allowed by order of the Court (whether before or after notice of such Event of Default) and payable pursuant to an order of the Court and incurred in accordance with the DIP Financing Documents), and (iii) the

7

reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code.  So long as no Event of Default shall have occurred and be continuing, the Debtors shall, subject to the DIP Financing Documents, be permitted to pay compensation and reimbursement of expenses allowed by the Court and payable under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, and the same shall not reduce the Carveout. Notwithstanding anything to the contrary contained in this Order, to the extent that any default provision of this Order corresponds to a similar default provision in the DIP Credit Agreement, all notice and cure provisions applicable to such default provisions contained in the DIP Credit Agreement shall also apply to such default provisions under this Order.

8.      Interest shall accrue on the DIP Loans at the non-default rate of 11% per annum, subject to any provision contained in the DIP Credit Agreement or this Order requiring a higher rate of interest.  Accrued interest on the DIP Loans shall be capitalized on the last Business Day of each calendar quarter, commencing June 30, 2024.  The DIP Loans (including all accrued interest that is capitalized) shall become due and payable and the DIP Loan Commitments shall terminate, as provided herein and in the DIP Credit Agreement.

9.      From and after the Effective Date, BMI shall use the proceeds of the DIP Loans solely as provided in the DIP Credit Agreement.  From and after the Effective Date, the proceeds of the DIP Loans shall not, directly or indirectly, be used to pay expenses of the Debtors or otherwise disbursed except for (i) those expenses and/or disbursements that are permitted under the DIP Credit Agreement, and (ii) compensation and reimbursement of expenses allowed by the Court to attorneys, accountants, financial advisors or other professional persons retained by the Debtors, the Committee, or the FCR, consistent with the DIP Credit Agreement; *provided* that the foregoing shall not be construed as consent to the allowance of any of the amounts referred to in

the preceding clauses (i) or (ii) and shall not affect the right of any party in interest to object to the allowance and payment of such amounts.  No administrative claims, including fees and expenses of professionals, shall be assessed against or attributed to the Lender by reason or on account of it acting as the Lender in accordance with the DIP Credit Agreement or making any loan pursuant to the DIP Credit Agreement, the Motion or this Order.  Except as set forth in the first sentence of this paragraph 9 and the DIP Credit Agreement, the Lender has not consented or agreed to the use of the proceeds of the DIP Loans.

10.     Upon five (5) days' written notice to the Debtors, the U.S. Trustee, the Committee, and the FCR, the automatic stay extant under section 362(a) of the Bankruptcy Code shall be, and it hereby is, modified to the extent necessary to permit the Lender to exercise its rights and remedies under the DIP Credit Agreement in accordance with paragraphs 11 and 12 of this Order.

11.     Notwithstanding anything herein or in the DIP Credit Agreement, other than the Carveout (only to the extent of the unused DIP Loan Commitment Amount), BMI shall no longer be authorized to borrow funds under the DIP Credit Agreement upon the occurrence of a Termination Event.

12.     Notwithstanding the occurrence of the Termination Date or anything herein, all of the rights, remedies, benefits and protections provided to the Lender under this Order shall survive the Termination Date.  Upon the Termination Date, the principal of and accrued interest and all other amounts owed to the Lender under the DIP Credit Agreement or this Order as of the Termination Date shall be recognized as a non-priority, non-administrative, general unsecured claim against the Borrower for all Obligations and other amounts due and owing under the DIP Credit Agreement and the other DIP Financing Documents, and the Lender shall have all other rights and remedies provided in the DIP Credit Agreement.  No obligation, payment, or transfer

under the DIP Credit Agreement or this Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including, without limitation, under sections 502(d), 544, 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.

13.     Notwithstanding anything herein to the contrary, no DIP Loans may be used by the Debtors, the Committee, the FCR, or any other person or entity to assert or prosecute claims, causes of action, objections, contests, or defenses against the Lender (in its capacity as the Lender under the DIP Credit Agreement), other than to enforce the terms of the DIP Credit Agreement or this Order.

14.     If it shall be necessary for the Lender, at any time, to exercise any of its rights and remedies hereunder or under applicable law, the Lender shall provide five (5) Business Days' notice of its election to exercise such remedies to the Debtors, the Committee, the FCR, and the U.S. Trustee and shall thereafter have the right without further order of the Court to exercise such rights and remedies as the Lender shall, in its sole discretion, elect, absent order of the Court to the contrary.  Notwithstanding the foregoing, nothing in this Order shall prejudice or impair the right of any party in interest to object to, or seek to enjoin, the Lender's exercise of any such rights or remedies.

15.     Without limiting the rights of access and information afforded to the Lender under the DIP Credit Agreement, the Debtors shall permit representatives, agents and/or employees of the Lender to have reasonable access to the premises of each Debtor and the records of each Debtor during normal business hours (without unreasonable interference with the proper operation of the business of each Debtor) and shall cooperate, consult with, and provide to such persons all such

non-privileged information as they may reasonably request, all to the extent set forth in the DIP Credit Agreement.

16.     The provisions of this Order shall be binding upon and inure to the benefit of the Lender and the Debtors and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of each Debtor's estate).

17.     Nothing in this Order, the DIP Credit Agreement, or any other document related to the DIP Loans shall in any way be construed or interpreted to impose upon the Lender any liability for any claims arising from the pre-petition or post-petition activities of any Debtor in the operation of its business or in connection with its restructuring effort.

18.     In determining to make any DIP Loan, or in exercising any rights or remedies as and when permitted pursuant to this Order, or the DIP Credit Agreement, the Lender shall not be deemed to be in control of any Debtor or its operations.

19.     Based on the findings set forth in paragraphs E and H of this Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the post-petition financing arrangement contemplated by this Order, in the event any or all of the provisions of this Order are hereafter reversed or modified by a subsequent order of this or any other Court, no such reversal or modification shall affect the authorization and incurring of debt authorized hereby, unless the authorization and incurring of such debt is stayed pending appeal.

20.     The Lender shall not be required to file proofs of claim in the Chapter 11 Cases or any such successor cases (collectively, the "**Successor Cases**") in order to assert claims for payment of the DIP Loans.  The Debtors' acknowledgments and the provisions of this Order, together with the evidence accompanying the Motion and presented at the Hearing, are deemed

sufficient to and do constitute a timely filed proof of claim in respect of such claim arising under the DIP Loans against BMI. Any order entered by the Court establishing a bar date in the Chapter 11 Cases or any Successor Cases shall not apply to the Lender or the DIP Loans.

21.     Notwithstanding anything herein, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, (x) any of the rights of the Lender under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of the Lender to (i) request relief from or modification of the automatic stay extant under section 362 of the Bankruptcy Code, (ii) request conversion of the Chapter 11 Cases to chapter 7, (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans, and (iv) object to the fees and expenses of any retained professionals of the Debtors, the Committee, and the FCR, or (y) any of the rights, claims or privileges (whether legal, equitable or otherwise) of the Lender.

22.     Other than providing the Lender with a non-administrative general unsecured claim against BMI that is *pari passu* with pre-petition general unsecured claims against BMI, nothing in the DIP Financing Documents shall: (i) provide the Lender with any control over any asset of the Debtors' estates, including causes of action; (ii) prejudice, impair, or impede, in any way whatsoever, any unsecured claims, rights and remedies held by any creditor that is not the Lender in these Chapter 11 Cases; or (iii) provide the Lender with any rights to assert any other claim against the Debtors' estates.

23.     Except where expressly indicated in this Order to the contrary, in the event there is any inconsistency between the provisions of this Order and the DIP Credit Agreement, the provisions of this Order shall govern.

12

24.     The Court shall retain jurisdiction to enforce the provisions of this Order and the DIP Credit Agreement, and this retention of jurisdiction shall survive the confirmation and consummation of each Debtor's chapter 11 plan.

25.     This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.

Dated: _____, 2024
        Houston, Texas

                                        _____
                                        MARVIN ISGUR
                                        UNITED STATES BANKRUPTCY JUDGE

## **Exhibit B**

Approved Budget

# 363 Asset Sale Forecast (Weeks 1-9)

| Week | | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Ending:[1] | 7-Apr | 14-Apr | 21-Apr | 28-Apr | 5-May | 12-May | 19-May | 26-May | 2-Jun | 9-Jun | 16-Jun | 23-Jun | 30-Jun | Weeks 1-9 |
| ($000's) | ACT | ACT | ACT | ACT | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | |
| Receipts[2] | $1,960 | $1,410 | $1,885 | $1,579 | $363 | $19 | – | – | $19 | – | – | – | – | $400 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Compensation | – | – | – | ($602) | | | | | | | | | | – |
| Benefits | – | – | – | (241) | | | | | | | | | | – |
| Operating Expenses | (77) | (57) | (145) | (400) | | | | | | | | | | – |
| Maintenance | (104) | (15) | (87) | (31) | | | | | | | | | | – |
| Operating Supplies | (2) | (52) | (31) | (3) | | | | | | | | | | – |
| Utilities | (35) | – | (22) | (151) | | | | | | | | | | – |
| Crude/Pack | (138) | (71) | (10) | (85) | | | | | | | | | | – |
| Freight Cost | (139) | (73) | (70) | (81) | | | | | | | | | | – |
| Plant Administration Expense | (85) | (13) | – | (15) | | | | | | | | | | – |
| Shared Services | – | – | – | (407) | – | – | – | (60) | – | – | – | – | (75) | (135) |
| Ordinary Course Prof. Fees | (16) | (5) | (4) | (0) | | | | | | | | | | – |
| Capital Expenditure | (199) | (92) | (87) | (59) | | | | | | | | | | – |
| Taxes/Fixed Cost | (11) | – | – | – | (0) | (87) | (400) | (0) | (0) | (0) | – | – | – | (488) |
| **Total Operating Disbursements** | **($807)** | **($378)** | **($455)** | **($2,075)** | **($0)** | **($87)** | **($400)** | **($0)** | **($0)** | **($0)** | **–** | **–** | **($75)** | **($623)** |
| **Net Operating Cash Flow** | **$1,153** | **$1,031** | **$1,430** | **($496)** | **$363** | **($69)** | **($400)** | **($60)** | **$18** | **($0)** | **–** | **–** | **($75)** | **($223)** |
| **Restructuring Items:** | | | | | | | | | | | | | | |
| Professional Fees[3] | ($1,208) | ($1,823) | ($414) | ($790) | ($327) | ($1,115) | ($3,858) | ($2,856) | ($419) | ($4,172) | ($4,000) | – | ($330) | ($17,076) |
| Utility Deposit - Adequate Assurance | – | – | – | – | – | – | – | 400 | – | – | – | 138 | – | 400 |
| MTI Receivable Reserve | – | – | – | – | – | – | – | 400 | – | – | – | – | – | 400 |
| US Trustee Fees | – | – | – | – | (190) | – | – | – | – | – | – | (244) | – | (434) |
| Interest Payment[4] | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Other Financing Fees | – | – | – | – | – | – | – | (375) | – | – | – | – | – | (375) |
| Cash Reserve Funding | – | – | – | – | – | – | – | (5,000) | – | – | – | – | – | – |
| **Total Restructuring Items** | **($1,208)** | **($1,823)** | **($414)** | **($790)** | **($517)** | **($1,115)** | **($3,858)** | **($7,831)** | **($419)** | **($4,172)** | **($4,000)** | **–** | **($435)** | **($22,347)** |
| **Exit / Wind Down Items:** | | | | | | | | | | | | | | |
| Professional Fees Accrued at Exit | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Less: UST Fees | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Less: Additional Contingency | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| **Total Exit / Wind Down Items** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** |
| Beginning Cash | $4,861 | $4,827 | $6,035 | $7,051 | $20,797 | $20,642 | $19,459 | $15,201 | $12,310 | $11,909 | $7,738 | $8,738 | $8,738 | $20,797 |
| Net Operating Cash flow | 1,153 | 1,031 | 1,430 | (496) | 363 | (69) | (400) | (60) | 18 | (0) | – | – | (75) | (223) |
| Restructuring Items | (1,208) | (1,823) | (414) | (790) | (517) | (1,115) | (3,858) | (7,831) | (419) | (4,172) | (4,000) | – | (435) | (22,347) |
| Exit / Wind Down Items | – | – | – | – | | | | | | | | | | – |
| DIP Financing | – | 2,000 | – | – | | | | | | | | | | – |
| Refinancing / Alternative Financing | – | – | – | – | – | – | – | 5,000 | – | – | 5,000 | – | – | 10,000 |
| Net Sale Proceeds | – | – | – | 15,032 | | | | | | | | | | |
| **Ending Cash[5]** | **$4,827** | **$6,035** | **$7,051** | **$20,797** | **$20,642** | **$19,459** | **$15,201** | **$12,310** | **$11,909** | **$7,738** | **$8,738** | **$8,738** | **$8,227** | **$8,227** |
| Unrestricted Cash | $4,827 | $6,035 | $7,051 | $20,797 | $20,642 | $19,459 | $15,201 | $12,310 | $11,909 | $7,738 | $8,738 | $8,738 | $8,227 | $8,227 |
| (+) Utility Deposit - Adequate Assurance | 139 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | – | – |
| (+) MTI Receivable Reserve | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | – | – | – | – | – | – |
| (+) Cash Reserve | – | – | – | – | – | – | – | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| **Total Cash[5]** | **$5,366** | **$6,574** | **$7,589** | **$21,335** | **$21,181** | **$19,997** | **$15,740** | **$17,448** | **$17,048** | **$12,876** | **$13,876** | **$13,876** | **$13,227** | **$13,227** |
| **DIP Schedule:** | | | | | | | | | | | | | | |
| *Unused DIP Availability (Ending)* | $17,000 | $15,000 | $15,000 | – | | | | | | | | | | |
| *DIP Ending Balance* | 13,000 | 15,000 | 15,000 | – | | | | | | | | | | |
| **Refinancing / Alternative Financing Facility Schedule:[4]** | | | | | | | | | | | | | | |
| *Unused Facility Availability (Ending)* | – | – | – | – | – | – | – | $25,000 | $25,000 | $25,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| *Refinancing Facility Ending Balance* | – | – | – | – | – | – | – | 5,000 | 5,000 | 5,000 | 10,000 | 10,000 | 10,056 | 10,056 |

1) *Cash flow presented in line with Debtors 4-4-5 accounting calendar*

2) *Includes amount in WE 5/5 for reconciliation of receipts collected prior to 4/29 sale close*

3) *Considers $4.0MM noticing and solicitation program fees in the WE 6/16*

4) *Assumes cash interest is accrued on JMB DIP facility through 4/29 repayment date. Assumes PIK interest on Refinancing / Alternative Financing facility is capitalized on quarterly basis*

5) *Ending cash excludes restricted cash, and considers a $1.0MM minimum cash balance. Total cash excludes Net Jefferies Transaction Fee, Net Transaction Fee assumed to be held in escrow*



# 363 Asset Sale Forecast (Weeks 10-22)

| Week | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | TOTAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Ending:[1] | 7-Jul | 14-Jul | 21-Jul | 28-Jul | 4-Aug | 11-Aug | 18-Aug | 25-Aug | 1-Sep | 8-Sep | 15-Sep | 22-Sep | 29-Sep | Weeks 10-22 | 22 Weeks |
| ($000's) | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | | |
| **Receipts** | $19 | – | – | – | $19 | – | – | – | $19 | – | – | – | – | $56 | $455 |
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| Compensation | | | | | | | | | | | | | | – | – |
| Benefits | | | | | | | | | | | | | | – | – |
| Operating Expenses | | | | | | | | | | | | | | – | – |
| Maintenance | | | | | | | | | | | | | | – | – |
| Operating Supplies | | | | | | | | | | | | | | – | – |
| Utilities | | | | | | | | | | | | | | – | – |
| Crude/Pack | | | | | | | | | | | | | | – | – |
| Freight Cost | | | | | | | | | | | | | | – | – |
| Plant Administration Expense | | | | | | | | | | | | | | – | – |
| Shared Services | – | – | – | (60) | – | – | – | (60) | – | – | – | – | (75) | (195) | (330) |
| Ordinary Course Prof. Fees | | | | | | | | | | | | | | | |
| Capital Expenditure | | | | | | | | | | | | | | | |
| Taxes/Fixed Cost | – | – | (0) | (0) | (0) | – | – | (325) | (0) | (0) | (0) | (0) | (0) | (326) | (814) |
| **Total Operating Disbursements** | – | – | ($0) | ($60) | ($0) | – | – | ($385) | ($0) | ($0) | ($0) | ($0) | ($75) | ($521) | ($1,144) |
| **Net Operating Cash Flow** | $19 | – | ($0) | ($60) | $18 | – | – | ($385) | $18 | ($0) | ($0) | ($0) | ($75) | ($466) | ($688) |
| **Restructuring Items:** | | | | | | | | | | | | | | | |
| Professional Fees[2] | ($3,695) | ($1,520) | – | ($355) | ($50) | ($6,420) | – | ($405) | – | ($3,163) | – | ($155) | ($275) | ($16,039) | ($33,115) |
| Utility Deposit - Adequate Assurance | – | – | – | – | – | – | – | – | – | – | – | – | – | – | 138 |
| MTI Receivable Reserve | – | – | – | – | – | – | – | – | – | – | – | – | – | – | 400 |
| US Trustee Fees | – | – | – | – | – | – | – | – | – | – | – | – | (216) | (216) | (650) |
| Interest Payment[3] | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Other Financing Fees | – | – | – | – | – | – | – | – | – | – | – | – | – | – | (375) |
| Cash Reserve Funding | – | – | – | – | – | – | – | – | – | – | – | – | – | – | (5,000) |
| **Total Restructuring Items** | ($3,695) | ($1,520) | – | ($355) | ($50) | ($6,420) | – | ($405) | – | ($3,163) | – | ($155) | ($491) | ($16,254) | ($38,601) |
| **Exit / Wind Down Items:** | | | | | | | | | | | | | | | |
| Professional Fees Accrued at Exit | – | – | – | – | – | – | – | – | – | – | – | – | – | ($8,640) | ($8,640) | ($8,640) |
| Less: UST Fees | – | – | – | – | – | – | – | – | – | – | – | – | (250) | (250) | (250) |
| Less: Additional Contingency | – | – | – | – | – | – | – | – | – | – | – | – | (1,500) | (1,500) | (1,500) |
| **Total Exit / Wind Down Items** | – | – | – | – | – | – | – | – | – | – | – | – | ($10,390) | ($10,390) | ($10,390) |
| Beginning Cash | $8,227 | $4,550 | $3,030 | $3,030 | $2,615 | $2,583 | $1,163 | $1,163 | $1,373 | $1,392 | $1,228 | $1,228 | $1,073 | $8,227 | $20,797 |
| Net Operating Cash flow | 19 | – | (0) | (60) | 18 | – | – | (385) | 18 | (0) | (0) | (0) | (75) | (466) | (688) |
| Restructuring Items | (3,695) | (1,520) | – | (355) | (50) | (6,420) | – | (405) | – | (3,163) | – | (155) | (491) | (16,254) | (38,601) |
| Exit / Wind Down Items | – | – | – | – | – | – | – | – | – | – | – | – | (10,390) | (10,390) | (10,390) |
| DIP Financing | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Refinancing / Alternative Financing | – | – | – | – | – | 5,000 | – | 1,000 | – | 3,000 | – | – | 11,000 | 20,000 | 30,000 |
| Net Sale Proceeds | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| **Ending Cash[4]** | $4,550 | $3,030 | $3,030 | $2,615 | $2,583 | $1,163 | $1,163 | $1,373 | $1,392 | $1,228 | $1,228 | $1,073 | $1,117 | $1,117 | $1,117 |
| Unrestricted Cash | $4,550 | $3,030 | $3,030 | $2,615 | $2,583 | $1,163 | $1,163 | $1,373 | $1,392 | $1,228 | $1,228 | $1,073 | $1,117 | $1,117 | $1,117 |
| (+) Utility Deposit - Adequate Assurance | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| (+) MTI Receivable Reserve | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| (+) Cash Reserve | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| **Total Cash[4]** | $9,550 | $8,030 | $8,030 | $7,615 | $7,583 | $6,163 | $6,163 | $6,373 | $6,392 | $6,228 | $6,228 | $6,073 | $6,117 | $6,117 | $6,117 |
| **DIP Schedule:** | | | | | | | | | | | | | | | |
| Unused DIP Availability (Ending) | | | | | | | | | | | | | | | |
| DIP Ending Balance | | | | | | | | | | | | | | | |
| **Refinancing / Alternative Financing Facility Schedule:[3]** | | | | | | | | | | | | | | | |
| Unused Facility Availability (Ending) | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $15,000 | $15,000 | $14,000 | $14,000 | $11,000 | $11,000 | $11,000 | – | – | – |
| Refinancing Facility Ending Balance | 10,056 | 10,056 | 10,056 | 10,056 | 10,056 | 15,056 | 15,056 | 16,056 | 16,056 | 19,056 | 19,056 | 19,056 | 30,458 | 30,458 | 30,458 |

1) *Cash flow presented in line with Debtors 4-4-5 accounting calendar*

2) *Considers $4.0MM noticing and solicitation program fees in the WE 6/16*

3) *Assumes cash interest is accrued on JMB DIP facility through 4/29 repayment date. Assumes PIK interest on Refinancing / Alternative Financing facility is capitalized on quarterly basis*

4) *Ending cash excludes restricted cash, and considers a $1.0MM minimum cash balance. Total cash excludes Net Jefferies Transaction Fee, Net Transaction Fee assumed to be held in escrow*

